NO. 12-02-00115-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


PLAINVIEW MOTELS, INC. D/B/A
§
 APPEAL FROM THE 273RD

SURPLUS SALES,

APPELLANT



V.
§
 JUDICIAL DISTRICT COURT OF


PHILIP REYNOLDS AND WIFE,

LUCY REYNOLDS, INDIVIDUALLY

AND AS NEXT FRIEND AND

NATURAL GUARDIAN OF

DILLON REYNOLDS, A MINOR,

APPELLEES
§
 SHELBY COUNTY, TEXAS

 

CORRECTED OPINION


 Our opinion of July 9, 2003 is withdrawn, and this corrected opinion is issued to correct the
number of the district court. 

 Plainview Motels, Inc. d/b/a Surplus Sales ("Surplus Sales") appeals the trial court's
judgment entered in favor of Philip Reynolds ("Dr. Reynolds") and Lucy Reynolds ("Mrs.
Reynolds"), individually and as next friend and natural guardian of Dillon Reynolds ("Dillon")
(collectively "Reynolds"). Surplus Sales raises nine issues (1) on appeal. We affirm in part, and
reverse and render in part.



Background

 On July 28, 1998, Dr. Reynolds, while looking through the stack of mirrors on Surplus
Sales's premises, stood several mirrors up vertically while attempting to look at other mirrors deeper
in the stack. As Dr. Reynolds reached for and erected another group of mirrors, the bottom of these
mirrors slipped and crashed against the other group of mirrors Dr. Reynolds was already steadying. 
The force of the crash caused the group of mirrors Dr. Reynolds was steadying to fall over onto Dr.
Reynolds and Dillon, who was standing at Dr. Reynolds's feet. Dr. Reynolds sustained injuries to
his back, knees and hand. Dillon, while under the mirrors, stopped breathing and lost consciousness. 
Once Dillon was pulled from beneath the mirrors, Mrs. Reynolds successfully resuscitated him and
he was taken to the hospital where he received emergency medical attention. At one point, Dillon
lost kidney function for approximately twenty-four hours, but ultimately recovered from his injuries. 
Both Dr. and Mrs. Reynolds sustained multiple lacerations as a result of the accident.

 Reynolds brought suit against Surplus Sales and the matter proceeded to jury trial. During
trial, Reynolds called Dr. Carl Hansen ("Hansen"), a vocational rehabilitation expert, who was
permitted to testify over Surplus Sales's objection. The court's charge was subsequently submitted
over Surplus Sales's objections and thereafter, the jury rendered a verdict and award in favor of
Reynolds. Judgment was entered by the trial court on January 25, 2002. Surplus Sales filed a
motion for judgment n.o.v. on February 22, 2002, which was denied. Surplus Sales filed a motion
for new trial on February 22, 2002, which was denied on March 21, 2002. This appeal followed.


Evidentiary Sufficiency


 In its third issue, Surplus Sales argues that the evidence was legally and factually insufficient
to support the trial court's judgment.

Legal Sufficiency

 In reviewing a legal sufficiency issue, we must consider only the evidence and inferences that
tend to support the jury's verdict, disregarding all contrary evidence and inferences. See Wal-Mart
Stores, Inc. v. Gonzalez, 968 S.W.2d 934, 936 (Tex. 1998). We may only sustain a "no evidence"
point when the record discloses one of the following: (1) there is a complete absence of evidence of
a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only
evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than
a mere scintilla of evidence, or (4) the evidence establishes conclusively the opposite of a vital fact. 
See Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). It is not within our
power to second-guess the fact-finder unless only one inference can be drawn from the evidence. 
See State v. $11,014.00, 820 S.W.2d 783, 785 (Tex. 1991). If there is more than a scintilla of
evidence to support the finding, the evidence is legally sufficient. See Browning-Ferris, Inc. v.
Reyna, 865 S.W.2d 925, 928 (Tex. 1993).

 In order to successfully prosecute a cause of action for premises defect, Reynolds was
required to prove that (1) the defendant was an owner or occupier of the premises, (2) a condition
on the premises posed an unreasonable risk of harm, (3) the defendant knew or reasonably should
have known of the danger, (4) the defendant failed to exercise reasonable care to reduce or eliminate
the risk of harm, and (5) the defendant's breach proximately caused the plaintiff's injuries. See
CMH Homes, Inc. v. Daenen, 15 S.W.3d 97, 99 (Tex. 1999). Surplus Sales does not contest that
it was the owner or occupier of the premises in question.

Condition Posed Unreasonable Risk of Harm

 A condition poses an unreasonable risk of harm for premises defect purposes when there is
a "sufficient probability of a harmful event occurring that a reasonably prudent person would have
foreseen it or some similar event as likely to happen." County of Cameron v. Brown,, 80 S.W.3d
549, 556 (Tex. 2002). Foreseeability does not require that the exact sequence of events that
produced an injury be foreseeable. Id. Instead, only the general danger must be foreseeable. See
Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996).

 As a matter of law, the mere fact that a store has a customer sampling display cannot, without
more, be evidence of a condition on the premises that poses an unreasonable risk of harm. See H.E.
Butt Grocery Co. v. Resendez, 988 S.W.2d 218, 219 (Tex. 1999). In reaching its decision, the court
in Resendez distinguished that case from its previous decision in Corbin v. Safeway Stores, Inc.,
648 S.W.2d 292 (Tex. 1983), noting that in Corbin, it stated that the self-service grape bin in
conjunction with the absence of any protective covering on the store's green linoleum tile floor posed
an unusually high risk of customer falls resulting from grapes dropped on the floor. Id. at 297. 
Comparing Resendez and Corbin, it is apparent that the question of whether a self-service display
is unreasonably dangerous can only be answered by considering the nature of the display in light of,
but not limited to, its surroundings. Compare Resendez, 988 S.W.2d at 219 with Corbin, 648
S.W.2d at 297.

 In the case at hand, Surplus Sales's display consisted of multiple mirrors stacked vertically,
one against the other and leaning at a slight angle against a two-by-four support post. Although the
total number of mirrors was unclear from the record, their combined weight (2) was significant, which
is apparent from the fact that it was sufficient to trap an adult male and ultimately, required the
strength of between three and four adults to be removed. (3) The nature of Surplus Sales's business is
that customers will view items in one of Surplus Sales's warehouses, help themselves to such items
as they may desire, and transport such items to the checkout area of the facility. Surplus Sales argues
that the testimony of Barry Lee Richard ("Richard"), a certified safety professional and consultant,
who testified that the manner in which the mirrors were displayed was "stable" and "not
precarious[,]" is the only evidence related to this element. We disagree.

 The jury could reasonably determine that a group of thirty-pound mirrors leaning against a
support column could potentially fall. Moreover, given the nature of Surplus Sales's business, it is
a reasonable deduction from the evidence that, no matter how stable the stack is, a customer desiring
a mirror deep within the stack could seek to move some of the mirrors around to look at others or
remove a mirror that strikes his fancy. Considering that a customer could reasonably be expected
to move any number of mirrors while examining them, the jury could further surmise that the
potential for prolonged stability of the display without upset was, at best, fleeting and that the notion
that the display was stable so long as it remained undisturbed was contrary to the nature of Surplus
Sales's business. 

 Professional safety management consultant Wayne Seelbach ("Seelbach") testified that the
manner in which the mirrors in question were displayed was hazardous and not in accordance with
industry standards. Seelbach further testified that the mirrors should have been displayed in bins
with an upright support on each side of the stack, with such bins placed perpendicular to the aisle,
rather than in the aisle. Finally, the record reflects that Surplus Sales had such storage bins on the
premises, but did not use them to store mirrors. Similar to the absence of a protective floor covering
in Corbin, Surplus Sales's failure to utilize a storage bin to display the mirrors in question further
supports the jury's determination that the display in the instant case was unreasonably dangerous. 
Therefore, considering the totality of the circumstances surrounding the self-service display in the
instant case, we conclude that there was evidence to support the jury's finding.

Defendant Knew or Reasonably Should Have Known of the Danger

 To prove an action for premises liability, the invitee must establish that a land owner either
"knew, or after reasonable inspection should have known, of an unreasonably dangerous condition."
Motel 6 G.P. v. Lopez, 929 S.W.2d 1, 3-4 (Tex. 1996). A possessor's knowledge can be actual or
constructive. See Corbin, 648 S.W.2d at 295-96. Actual knowledge is what a person actually
knows. See Black's Law Dictionary 876 (7th ed. 1999). On the other hand, proof of constructive
knowledge requires only that the condition existed long enough for the possessor to have discovered
it upon reasonable inspection. See Daenen, 15 S.W.3d at 102-03.

 Surplus Sales argues that Reynolds produced no evidence tending to show Surplus Sales
either knew or should have known of the unreasonably dangerous condition of the stacked mirrors. 
Specifically, Surplus Sales contends that although the evidence that the mirrors fell onto Dr.
Reynolds and Dillon may suggest that the mirrors were stacked in a precarious manner, such
evidence does not address Surplus Sales's knowledge of a dangerous condition. As to evidence of
its constructive knowledge, Surplus Sales argues that the dangerous condition was created when Dr.
Reynolds haphazardly pulled too many mirrors toward him and that there was no way a reasonable
inspection by Surplus Sales would have revealed this. Moreover, Surplus Sales notes that the fact
that such an accident had not previously occurred with such a display further supports that it had no
constructive knowledge. We disagree.

 Whether the risk has ever materialized prior to the incident in question is unrelated to the
question of whether Surplus Sales had actual or constructive knowledge of the unreasonable risk of
harm posed by the condition. See Safeway Stores, Inc. v. Scamardo, 673 S.W.2d 363, 371 (Tex.
App.-Houston [1st Dist.] 1984, no writ). As set forth above, there is evidence of record to support
the jury's finding that the display in question was unreasonably dangerous. Such evidence was
apparent from the physical qualities of the mirrors displayed, the manner in which the mirrors were
displayed, the nature of Surplus Sales's business, and the absence of available safety features that
could be incorporated therein. Moreover, Jones testified that employees of Surplus Sales set up the
mirror display in question. The record further reflects that the mirrors had been displayed in such
a manner for at least three or four days prior to the incident in question. All of the evidence set forth
above, which tends to support the jury's conclusion that the display was unreasonably dangerous,
was or should have been readily apparent to Surplus Sales from the moment they set up the display
in such a manner. As such, we hold that there is evidence in the record to support the jury's finding
that Surplus Sales either knew or, after reasonable inspection should have known, of the
unreasonably dangerous condition.

Defendant Failed to Exercise Reasonable Care to Reduce or Eliminate Risk of Harm

 When a possessor of land has actual or constructive knowledge of any condition on the
premises that poses an unreasonable risk of harm to invitees, he has a duty to take whatever action
is reasonably prudent under the circumstances to reduce or to eliminate the unreasonable risk from
that condition. See Corbin, 648 S.W.2d at 295. Surplus Sales argues that its duty to exercise
reasonable care is predicated on its knowledge of a dangerous condition. As set forth above, there
is evidence in the record to support the jury's finding that Surplus Sales either knew or, after
reasonable inspection should have known, of an unreasonably dangerous condition. Thus, Surplus
Sales's duty to exercise reasonable care to reduce or eliminate the risk of harm was triggered. 

 Seelbach testified that the mirrors could have been more safely displayed in bins with an
upright support on each side of the stack, with the bins placed perpendicular to the aisle, rather than
in the aisle. The record reflects that Surplus Sales had such storage bins on the premises, but did not
use them to store mirrors. Moreover, Seelbach explained that Surplus Sales should have required
its customers to only look at the mirrors with assistance from an employee of Surplus Sales, posted
notice of such a policy, and warned customers of the dangers associated with moving the mirrors
without assistance in order to increase safeguards with regard to the mirror display. Mrs. Reynolds
testified that no one ever offered to help her or told her that she needed to ask for help if she wanted
to look at the mirrors. Surplus Sales contends that evidence concerning alternative storage methods
is not indicative of the level of reasonable care it exercised. But, as we have stated above, the record
supports the jury's conclusion that the mirror display in the instant case was unreasonably dangerous. 
Our current focus is what efforts were made by Surplus Sales to reduce or eliminate the risk
associated with such a display. From the evidence presented, we conclude that the jury could
reasonably deduce that Surplus Sales did not make reasonable efforts to reduce or eliminate the risk
associated with its mirror display.

Defendant's Breach Proximately Caused the Plaintiff's Injuries

 To prove an action for premises defect, the invitee must establish that the defendant's lack
of care proximately caused his injuries. See Daenen, 15 S.W.3d at 99; Corbin, 648 S.W.2d at 296. 
The components of proximate cause are (1) cause-in-fact and (2) foreseeability. See Travis v. City
of Mesquite, 830 S.W.2d 94, 98 (Tex. 1992). 

 Cause-in-Fact

 The test for cause-in-fact is whether the negligent act or omission was a substantial factor in
bringing about the injury and without which the injury would not have occurred. Id. Cause-in-fact
must be proved by evidence of probative force and not by mere conjecture, guess, or speculation. 
See Leitch v. Hornsby, 935 S.W.2d 114, 119 (Tex. 1996). The evidence must be sufficient for the
jury to determine within a reasonable probability that the plaintiff's injury would not have occurred
without the defendant's negligence. See Lenger v. Physician's Gen., Inc., 455 S.W.2d 703, 706
(Tex. 1970). Cause-in-fact is not shown when the defendant's conduct is too remotely connected
with the plaintiff's injury to constitute legal causation. See Union Pump Co. v. Allbriton, 898
S.W.2d 773, 775 (Tex. 1995).

 In the case at hand, the record reflects that an employee of Surplus Sales set up the display
in question. As set forth above, Surplus Sales failed to take necessary steps to reduce or eliminate
the risk of harm such as utilizing bins it had on the premises to safely display the mirrors or requiring
that customers examine mirrors only with assistance from Surplus Sales personnel. Had Surplus
Sales displayed the mirrors in question in a bin, the mirrors would have been prevented from falling
backwards and would have been contained by the bin had they started to slip out from the bottom. 
Furthermore, had Surplus Sales required customers to seek assistance before handling mirrors, Dr.
Reynolds would never been in a position to handle the stack of mirrors. It follows that, but for
Surplus Sales's act of setting up the display in question coupled with its failure to reduce or eliminate
the risk of harm associated with the display, Reynolds's injury would not have occurred. We
conclude that such acts and omissions were a substantial factor in bringing about Reynolds's injuries.

 Foreseeability

 To prove foreseeability, the plaintiff must establish that a person of ordinary intelligence
should have anticipated the danger created by the negligent act or omission. See Nixon v. Mr.
Property Management Co., 690 S.W.2d 546, 549-50 (Tex. 1985). Foreseeability does not require
a person to foresee the particular accident or injury that, in fact, occurs. See Travis, 830 S.W.2d at
98. Foreseeability requires only that (1) the injury be of such a general character as might reasonably
have been anticipated, and (2) the injured party be so similarly situated in relation to the wrongful
act that the injury to her or to someone similarly situated might reasonably have been foreseen. See
Nixon, 690 S.W.2d at 551. The question of foreseeability involves a practical inquiry based on
"common experience applied to human conduct." City of Gladewater v. Pike, 727 S.W.2d 514, 518
(Tex. 1987). It asks whether the injury might reasonably have been anticipated as a result of the
defendant's conduct. See id.

 In the case at hand, as set forth previously, there is evidence of record to support the jury's
conclusion that the display in question was unreasonably dangerous. The root of the unreasonable
danger is that such a display could collapse. The indicia of the display's potential for collapse was
apparent from the physical qualities of the mirrors displayed, the manner in which the mirrors were
displayed, the nature of Surplus Sales's business, and the absence of available safety features that
could be incorporated therein. From such evidence, the jury could have concluded that the general
character of Reynolds's injury should have been reasonably anticipated by Surplus Sales. 

 Furthermore, considering that the display in question was self-serve, it is a reasonable
deduction from the evidence that, no matter how stable the mirror stack was intended to be, a
customer, desiring a mirror deep within the stack, could seek to move some of the mirrors around
to look at others or remove a mirror that strikes his fancy. Considering that a customer could
reasonably be expected to move any number of mirrors while examining them, and was not notified
that he should seek assistance in so doing, the jury could further conclude that the potential for
prolonged stability of the display without upset was, at best, fleeting, and that such injury to
Reynolds, a customer serving himself in such a manner, or any other customer similarly situated,
should have been reasonably foreseen. Therefore, we conclude that there was evidence from which
the jury could reasonably determine that Surplus Sales's breach of duty proximately caused
Reynolds's injuries.

Damages

 Surplus Sales's argument that the jury's finding that Surplus Sales was fifty percent negligent
is not supported by the evidence is based on its contentions as to the aforementioned elements of
Reynolds's premises liability claim. As we have determined that the jury's findings with regard
aforementioned elements are supported by the evidence, Surplus Sales's argument with regard to
damages is without merit. Surplus Sales's other arguments related to the jury's damages award
raised in separate issues will be considered in conjunction with those issues.

Factual Sufficiency

 When evaluating a factual sufficiency challenge, we will consider and weigh all of the
evidence in the case, both evidence supporting the verdict and evidence which tends to contradict
the facts upon which the jury based its verdict. See In re King's Estate, 244 S.W.2d 660, 661 (Tex.
1951). We may not substitute our conclusions for those found by the jury and will reverse only if
we conclude that the verdict is so against the great weight and preponderance of the evidence as to
be manifestly unjust. Id. As set forth above, there is sufficient evidence to support the jury's finding
related to premises liability. Our review of the record as a whole has not uncovered any evidence
that is so against the great weight and preponderance of the evidence supporting the verdict so as to
cause us to conclude that the jury's verdict is manifestly unjust.

 Therefore, we hold that the evidence is both legally and factually sufficient to support the
jury's verdict as to Reynolds's premises liability claim. Surplus Sales's third issue is overruled.


Jury Charge Submission on Premises Liability

 In its first issue, Surplus Sales argues that there was insufficient evidence to support a jury
charge submission based on premises liability. In order for alleged charge error to constitute
reversible error, the trial court must have abused its discretion. See Texas Dep't of Human Servs.
v. E.B., 802 S.W.2d 647, 649 (Tex.1990); KPH Consolidation, Inc. v. Romero, 102 S.W.3d 135,
156 (Tex. App.-Houston [14th Dist.] 2003, no pet.). The court abuses its discretion in connection
with the charge if the error probably caused the rendition of an improper judgment. See Tex. R. App.
P. 44.1(a)(1); Romero, 102 S.W.3d at 156. In determining whether error is reversible, we must
consider the record as a whole, including the parties' pleadings, the evidence presented at trial, and
the charge in its entirety. Id. (citing Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,
710 S.W.2d 551, 555 (Tex.1986)). The litigants are entitled to have controlling issues of fact
submitted to the jury if they are properly pleaded and supported by some evidence. See Tex. R. Civ.
P. 278; Triplex Comm., Inc. v. Riley, 900 S.W.2d 716, 718 (Tex. 1995). The standard by which we
review a "no evidence" issue is set forth in our analysis of Surplus Sales's third issue.

 In the case at hand, considering Surplus Sales's "no evidence" contentions with regard to its
legal sufficiency issue, we held that the evidence is legally sufficient to support the jury's verdict as
to Reynolds's premises liability claim. It follows that there was sufficient evidence to support the
submission of Reynolds's premises liability issue to the jury. Thus, we hold that the trial court did
not abuse its discretion in submitting Reynolds's premises liability issue to the jury. Surplus Sales's
first issue is overruled.


Negligent Activity Charge Question

 In its second issue, Surplus Sales contends that the trial court erred in failing to submit its
charge question on negligent activity. The standard of review for submission of a jury charge issue
is set forth in our analysis of Surplus Sales's first issue.

 An owner or occupier of land has a duty to use reasonable care to keep premises under his
control in a safe condition. See Redinger v. Living, Inc., 689 S.W.2d 415, 417 (Tex. 1985). The
owner or occupier may be liable for negligence in two situations: (1) those arising from a premises
defect and (2) those arising from an activity or instrumentality. Id. When the alleged injury results
from the condition of the premises, the injured party can only recover under a premises defect theory. 
See H.E. Butt Grocery Co. v. Warner, 845 S.W.2d 258, 259 (Tex. 1992). A proprietor, however,
also owes a duty of ordinary care not to injure a licensee by the proprietor's own negligence. See,
e.g., Wochner v. Johnson, 875 S.W.2d 470, 473 (Tex. App.-Waco 1994, no writ); see also
Redinger, 689 S.W.2d at 418 (occupier of premises owed duty of reasonable care to subcontractor's
employee who was injured by negligent operation of tractor). When the alleged injury is the result
of a negligent activity, the injured party must have been injured by, or as a contemporaneous result
of, the activity itself, not by a condition the activity created. See Keetch v. Kroger Co., 845 S.W.2d
262, 264 (Tex. 1992). 

 In the instant case, Surplus Sales contends that Dr. Reynolds's moving the mirrors and
reaching for more mirrors was the activity contemporaneous with the Reynolds's injuries, and
therefore, the case should have been submitted under a negligent activity theory. However, in our
analysis of this distinction, we do not focus on the activities of the plaintiff, which relate to the issue
of contributory negligence, but rather on the activities of the defendant. See Restatement
(Second) of Torts § 341 (1965) (a possessor of land is subject to liability to his licensees for
physical harm caused to them by his failure to carry on his activities with reasonable care) (emphasis
added); Texas & N.O.R. Co. v. Blake, 175 S.W.2d 683, 685 (Tex. Civ. App.-Fort Worth 1943, writ
ref'd) (contributory negligence is a failure on the part of a plaintiff or injured person to exercise
ordinary care for his own safety). Here, the record does not reflect any allegations or evidence that
Surplus Sales engaged in any activities contemporaneous with the Reynolds's injuries. Thus, we
hold that the trial court did not abuse its discretion in refusing to submit the issue of negligent
activity to the jury. Surplus Sales's second issue is overruled.


Dr. Reynolds's Jury Award

 In its fourth issue, Surplus Sales argues that there is insufficient evidence to support the jury's
award to Dr. Reynolds for future loss of earning capacity and for future physical impairment. The
standard of review for evidentiary sufficiency is set forth in our analysis of Surplus Sales's issue
three. 

Loss of Future Earning Capacity

 Loss of earning capacity is the plaintiff's diminished capacity to earn a living. See
Metropolitan Life Ins. Co. v. Haney, 987 S.W.2d 236, 244 (Tex. App.-Houston [14th Dist.] 1999,
pet. denied). Loss of earnings is the loss of actual income due to an inability to perform a certain job
that the person held before the injury. See Border Apparel-East, Inc. v. Guardian, 868 S.W.2d 894,
897 (Tex. App.-El Paso 1993, no writ). Loss of earning capacity is the proper measure of damages,
not loss of earnings. See Dallas Ry. & Terminal Co. v. Guthrie, 210 S.W.2d 550, 552 (Tex. 1948);
Southwestern Bell Tel. Co. v. Sims, 615 S.W.2d 858, 864 (Tex. App.-Houston [14th Dist.] 1981,
no writ). Even an unemployed person can recover for lost earning capacity. See Brazoria County
v. Davenpart, 780 S.W.2d 827, 832 (Tex. App.-Houston [1st Dist.] 1989, no writ); North Houston
Pole Line Corp. v. McAllister, 667 S.W.2d 829, 833 (Tex. App. -Houston [14th Dist.] 1983, no
writ). Specific proof of loss of earnings is merely evidentiary of the ultimate issue. See Sims, 615
S.W.2d at 864.

 Loss of future earning capacity is the plaintiff's diminished capacity to earn a living after the
trial. See Border Apparel East, 868 S.W.2d at 897. Because the amount of money a plaintiff might
earn in the future is always uncertain, the jury has considerable discretion in determining the amount. 
See McIver v. Gloria, 169 S.W.2d 710, 712 (Tex. 1943); Tri-State Motor Transit Co. v. Nicar, 765
S.W.2d 486, 492 (Tex. App.-Houston [14th Dist.] 1989, no writ).

 To support an award of damages for loss of future earning capacity, the plaintiff must
introduce evidence sufficient to allow the jury to reasonably measure earning capacity in monetary
terms. See Bonney v. San Antonio Transit Co., 325 S.W.2d 117, 121 (Tex. 1959); City of Houston
v. Howard, 786 S.W.2d 391, 395-96 (Tex. App.-Houston [14th Dist.] 1990, writ denied). The
plaintiff does not have to show actual earnings, life expectancy, or even the plaintiff's employment
at the time of the injury. See McIver, 169 S.W.2d at 712; Wal-Mart Stores, Inc. v. Ard, 991 S.W.2d
518, 523 (Tex. App.-Beaumont 1999, pet. denied); Wal-Mart Stores, Inc. v. Cordova, 856 S.W.2d
768, 770 (Tex. App.-El Paso 1993, writ denied). An award of damages for loss of future earning
capacity can be based on a composite of factors that may affect a person's capacity to earn a living. 
See Haney, 987 S.W.2d at 244; Border Apparel-East, 868 S.W.2d at 897. To support an award of
damages for loss of future earning capacity, the plaintiff can introduce evidence of past earnings; the
plaintiff's stamina, efficiency, and ability to work with pain; the weaknesses and degenerative
changes that will naturally result from the plaintiff's injury; and the plaintiff's work-life expectancy. 
See Ard, 991 S.W.2d at 523; Border Apparel-East, 868 S.W.2d at 897; Nicar, 765 S.W.2d at 492;
McAllister, 667 S.W.2d at 833. There must be some evidence that the plaintiff had the capacity to
work prior to the injury, and that his capacity was impaired as a result of the injury. See Decker v.
Latham, 446 S.W.2d 113, 116 (Tex. Civ. App.-El Paso 1969, writ ref'd n.r.e.). 

 In the instant case, the record reflects that Dr. Reynolds was born on July 23, 1961. Dr.
Reynolds testified that he began practicing dentistry in 1986 and had experience in nearly every
aspect of his profession, except orthodontics. From his experience with a group practice in Plano,
Texas, Dr. Reynolds testified that he learned how to be a much more productive dentist. With regard
to oral surgery (4), which he testified involved more physical effort that any of the other disciplines,
Dr. Reynolds testified that about ninety-nine percent of the work was done while standing up and
that his duties required him to bend at the waist. As for general dentistry, Dr.Reynolds testified that
most, but not all, of the work permitted him to sit down. Dr. Reynolds testified that he moved back
to Center, Texas in 1998 and bought a chicken farm, but, following the accident, began practicing
dentistry again in October. Dr. Reynolds testified that he realized from his first day he started
practicing dentistry again that he was going to have problems standing and bending over the patients,
most of whom he could not work on while sitting down. (5) After taking more time off to further
recuperate from the accident, Dr. Reynolds testified that he taught at a dental hygiene school in
Tyler, Texas beginning in August 1999. While teaching, Dr. Reynolds testified that he worked an
eight-hour shift and was on his feet throughout the shift, during which time he suffered worsening
of his lower back problems. Dr. Reynolds further testified that beginning in August 2000, he worked
as a temporary dentist in Nacogdoches, Texas for approximately two months. (6) In October 2000, Dr.
Reynolds testified that he began working with Dr. Sid Fowler ("Dr. Fowler") part-time (7) until
December 2000. Dr. Reynolds testified that, during this time, when working full days, by midday,
he began suffering from back pain. 

 With the income from his chicken farm not meeting his expectations, Dr. Reynolds testified
that he sought to work as many as five days a week. Subsequently, Dr. Reynolds began working for
Dr. Warren Guy ("Dr. Guy") in Lufkin, Texas, beginning in January or February 2001, while, during
this same time period, filling in for another dentist in Livingston, Texas. Dr. Reynolds testified that
eventually, he began putting in more time at the office in Livingston through November 2001. 

 As for his back pain, Dr. Reynolds testified that he is taking several forms of prescribed pain
medication, but he does not feel he can take them while he works because they might impair his
ability to drive to work and perform his duties as a dentist. As such, Dr. Reynolds only takes anti-inflammatory medication during work hours. Dr. Reynolds testified that his back pain became worse
during the summer of 2001 and that by the end of that year, there was "not ever a day that [he did
not] hurt all the time."

 Dr. Reynolds continued testifying that during the last six months, he had to take time off and
decrease his patient load by about half in each of the three offices. Dr. Reynolds testified that he has
to take breaks during the day, which has cut down his productivity in each of the offices in which
he works. He also testified that he does not do oral surgery very often anymore, and that in Dr.
Fowler's office, he now performs no more than two oral surgeries per day, where in the past, he had
performed six. 

 Dr. Reynolds testified that he received a functional capacity evaluation from Dr. Richard
Bunch ("Dr. Bunch") in New Orleans. After performing numerous tests on Dr. Reynolds, Dr. Bunch
concluded that Dr. Reynolds, in order to avoid back surgery, should not stand or bend over for
periods of time greater than five minutes, which Dr. Reynolds testified eliminated the possibility of
his performing oral surgeries. Dr. Reynolds testified that oral surgery is about thirty-five percent of
his income. Dr. Bunch further concluded that Dr. Reynolds should avoid seated vibrations for long
periods of time, such as would occur during long car trips. Dr. Reynolds testified that he does not
practice dentistry in his hometown, and thus, he must take long car trips in order to get to work. Dr.
Bunch further concluded that Dr. Reynolds should avoid riding tractors, which Dr. Reynolds testified
reduced his productivity in conjunction with the operation of his chicken farm. Finally, Dr.
Reynolds testified that he is not able to perform general dentistry duties all day long, even while
seated, without having problems.

 As a result of his problems associated with the incident in question, Dr. Reynolds testified
that during the year preceding trial, he was still able to make $130,000. However, Dr. Reynolds
testified that, due to the harm he had done to his back by working so much, he was concerned that
he would not be able to make as much money the next year. Dr. Reynolds testified that he believed
he could have been capable of earning as much as $208,000 per year or more, had he not been
injured. Dr. Guy estimated that Dr. Reynolds could have made up to $500,000 per year working full
time, while Dr. Fowler estimated Dr. Reynolds's potential earnings at $300,000. Dr. Reynolds, who
was forty years old at the time of trial, further testified that he planned to work until he reached age
sixty or sixty-two. (8) We conclude that from such evidence, the jury could reasonably conclude that
Dr. Reynolds was entitled to an award of $585,000 for loss of future earning capacity. See
McAllister, 667 S.W.2d at 832-33 (court found support for the jury's award for lost future earning
capacity by considering the plaintiff's pain, which restricted her work capability, dividing the award
($72,000) by the plaintiff's work-life expectancy (retirement age of 65 less the plaintiff's age of 27
= 38 years), which equaled the annual reduction in her earnings (over $1,800 per year)). 

 Surplus Sales argues that the fact that (1) Dr. Reynolds earned more money in the year after
the accident than he had earned in any year preceding the accident and (2) Dr. Reynolds testified that
it was his intent to (a) operate his chicken farm, (b) supplement his chicken farm income with part-time dentistry and (c) spend more time at home with his wife and children demonstrates that there
was no damage to Dr. Reynolds's earning potential. However, recovery for loss of future earning
capacity does not require a showing of lost earnings. See Nicar, 765 S.W.2d at 492; Springer v.
Baggs, 500 S.W.2d 541, 544 (Tex. Civ. App.-Texarkana 1973, writ ref'd n.r.e.). Our courts have
consistently upheld judgments for reduced earning capacity, even though the plaintiff was making
as much or even more money after the injury than before, where it was shown that pain, weakness,
diminished functional ability or the like indicated that plaintiff's capacity to get and hold a job, or
his capacity for duration, consistency or efficiency of work was impaired. Nicar, 765 S.W.2d at 492;
Springer, 500 S.W.2d at 544-45. As such, that Dr. Reynolds earned more money during the year
following the accident is not relevant. Furthermore, Surplus Sales's argument concerning Dr.
Reynolds's goals in conjunction with his chicken farm must be considered in light of Dr. Reynolds's
testimony that he sought to practice dentistry four to five times per week because the income from
the chicken farm was negligible. Our review of the record has not revealed any contradictory
evidence so as to cause us to conclude that the jury's finding that Dr. Reynolds was entitled to
$565,000 in loss of future earning capacity was manifestly unjust. Therefore, we hold that the
evidence was both legally and factually sufficient to support the jury's award to Dr. Reynolds for lost
future earning capacity.

Future Physical Impairment

 Surplus Sales further argues that the evidence is insufficient to support the jury's award of
$25,000 to Dr. Reynolds for future physical impairment. In a personal injury case, a plaintiff can
recover damages for past and future physical impairment. See Blankenship v. Mirick, 984 S.W.2d
771, 777 (Tex. App.-Waco 1999, pet. denied). Physical impairment encompasses the inability to
participate in sports, hobbies, or other recreational activities. See, e.g., Southern Pac. Transp. Co.
v. Harlow, 729 S.W.2d 946, 950 (Tex. App.-Corpus Christi 1987), writ denied sub nom., Port
Terminal R.R. Ass'n v. Harlow, 745 S.W.2d 320 (Tex. 1988) (inability to play racquetball); Texas
Farm Prods. Co. v. Leva, 535 S.W.2d 953, 959 (Tex. App.-Tyler 1976, no writ) (inability to play
the saxophone).

 To recover damages for physical impairment as a separate compensable element of damages,
the plaintiff must prove he suffered an additional loss beyond that of lost earning capacity and pain
and suffering. See Harlow, 729 S.W.2d at 950; Green v. Baldree, 497 S.W.2d 342, 350 (Tex.
App.-Houston [14th Dist.] 1973, no writ). The impairment must produce a separate and distinct loss
for which the plaintiff should be compensated. See Green, 497 S.W.2d at 350. Unless the separate
and distinct loss is obvious, the plaintiff must produce some evidence showing the tasks or activities
that he can no longer perform. See Harlow, 729 S.W.2d at 950-51. The plaintiff does not need to
prove egregious injuries to recover for physical impairment. See Rosenboom Mach. & Tool, Inc.
v. Machala, 995 S.W.2d 817, 824 (Tex. App.-Houston [1st Dist.] 1999, pet. denied); Robinson v.
Minick, 755 S.W.2d 890, 893-94 (Tex. App.-Houston [1st Dist.] 1988, writ denied).

 In the instant case, the record reflects that Dr. Reynolds's injuries have impeded his ability
to get a good night's sleep, as he suffers sharp pains in his back throughout the night. His injuries
have further restricted his ability to run, bicycle, participate in triathlons, and play with his boys, all
of which Dr. Reynolds was able to enjoy prior to the accident. Based on our review of the record
as a whole, we hold that there was legally and factually sufficient evidence to support the jury's
award of damages for future physical impairment to Dr. Reynolds. Surplus Sales's fourth issue is
overruled.


Admissibility of Expert Testimony of Dr. Carl Hansen

 In its ninth issue, Surplus Sales argues that the trial court erred in allowing Hansen,
Reynolds's vocational expert, to testify. Specifically, Surplus Sales argues that Hansen was neither
qualified to testify as to Dr. Reynolds's ability to earn money before he was injured, nor to his work
life expectancy as a dentist. Further, Surplus Sales argues that Hansen's testimony did not assist the
trier of fact and was unreliable.

 But even assuming arguendo that Hansen's testimony was improperly admitted, in order for
the admission of such testimony to be grounds for reversal, such error, if any, must have been
harmful. See Tex. R. App. P. 44.1(a) (no judgment may be reversed on appeal on the ground that the
trial court made an error of law unless the court of appeals concludes that the error complained of
probably caused the rendition of an improper judgment). A successful challenge to evidentiary
rulings usually requires the complaining party to show that the judgment turns on the particular
evidence excluded or admitted. Texas Dep't of Transp. v. Able, 35 S.W.3d 608, 617 (Tex. 2000). 
In determining if the excluded evidence probably resulted in the rendition of an improper judgment,
a court must review the entire record. Id. (citing McCraw v. Maris, 828 S.W.2d 756, 758 (Tex.
1992)). Where testimony merely duplicates other testimony from other witnesses, the admission of
such testimony is not harmful. See Dalworth Trucking Company v. Bulen, 924 S.W.2d 728, 736
(Tex. App.-Texarkana 1996, no writ); see also Able, 35 S.W.3d at 617.

 In the instant case, all arguments concerning Hansen's testimony relate to the issue of Dr.
Reynolds's claim for future lost earning capacity. As evident from our analysis of Surplus Sales's
fourth issue, the record contains sufficient evidence apart from Hansen's testimony to support the
jury's award to Dr. Reynolds of damages for lost earning capacity. Indeed, the jury could have
reasonably found that Dr. Reynolds had a work life expectancy of 65 years, see McAllister, 667
S.W.2d at 832-33, two and one half years longer than the work life expectancy as set forth in
Hansen's testimony. Furthermore, Hansen's testimony that Dr. Reynolds could potentially earn
$208,000 per year is less than half the potential earnings set forth in the testimony of Dr. Guy and
$92,000 less than the amount Dr. Fowler testified Dr. Reynolds was capable of earning. Dr.
Reynolds's testimony with regard to his earning capacity and work life expectancy was the same as
that of Hansen. We conclude that the testimony of Hansen is duplicative of other evidence of record
and not controlling on a material issue dispositive to the case. See Able, 35 S.W.3d at 617; Bulen,
924 S.W.2d at 736. Even had the jury relied solely on the testimony of Hansen in calculating Dr.
Reynolds's award for lost future earning capacity, the resulting damages would have tripled the
amount of damages for lost future earning capacity actually awarded. (9) We hold that even if the trial
court committed error by admitting Hansen's testimony, such error, if any, was harmless. Surplus
Sales's ninth issue is overruled.


Dillon Reynolds's Jury Award for Past Physical Impairment

 In its sixth issue, Surplus Sales contends that the evidence was neither legally nor factually
sufficient to support the jury's award of damages to Dillon for past physical impairment. The
standard of review applicable to this issue as well as the law governing damages for physical
impairment are set forth above.

 Surplus Sales argues that testimony related to Dillon's condition indicates that as of the day
after the accident, he showed no signs of physical impairment as a result thereof and that no
testimony was presented to demonstrate that Dillon had any past physical impairments. Reynolds
argues that Dillon's award is supported by the testimony by Dr. and Mrs. Reynolds regarding the
grievous nature of the injuries Dillon suffered as he lay pinned underneath the mirrors, such as the
fact that (1) Dillon ceased breathing for an extended period of time, (2) Dillon's legs were pushed
up and bent over his shoulders, (3) Dillon was transported by helicopter from one emergency room
to another during which time he remained limp, lifeless and unconscious, and (4) Dillon lost normal
kidney function for approximately twenty-four hours. Reynolds further cites to Dillon's medical
records as evidence that Dillon "sustained significant impairment to his entire body" in the days after
these events occurred.

 Reynolds concedes that, as best as can be determined, Dillon will not likely suffer permanent
future brain damage or neurological compromise and appears to be a "normal boy." However,
Reynolds argues, without citation to any authority, that because Dillon was not of age to testify about
his impairments or to have the normal range of activities of a teenager or an adult does not mean that
he is incapable of suffering physical impairment. 

 Since Reynolds has failed to cite to any authority holding that the separate and distinct loss
from such injuries as suffered by Dillon is obvious, since we are aware of no such authority, and
since the record, including but not limited to the testimony of Dr. and Mrs. Reynolds and Dillon's
medical records, does not reveal any evidence of tasks or activities that Dillon, as a result of his
injuries, was unable to perform, we hold that the evidence is not legally sufficient to support the
jury's award of damages to Dillon for past physical impairment. See Harlow, 729 S.W.2d at 950-51. 
Surplus Sales's sixth issue is sustained. 


Reduction of Dillon Reynolds's Damages Award

 In its seventh issue, Surplus Sales argues that the trial court erred in failing to reduce Dillon's
damages to correlate with the percentage of Surplus Sales's negligence (10) and that the parental
immunity doctrine is inapplicable to the instant case. Whether Surplus Sales was entitled to a
reduction of Dillon's award based on Dr. Reynolds's percentage of negligence is a question of law. 
See Pacesetter Pools, Inc. v. Pierce Homes, Inc., 86 S.W.3d 827, 831 (Tex. App.-Austin 2002, no
pet.) (issue of contribution is a question of law). When an issue turns on a pure question of law, we
do not give any particular deference to legal conclusions of the trial court and apply a de novo
standard of review. See Trinity Indus., Inc. v. Ashland, Inc., 53 S.W.3d 852, 868 (Tex.
App.-Austin 2001, pet. denied). When a defendant is not jointly and severally liable, liability is
calculated by multiplying the defendant's percentage of fault by the total amount of damages. See
Tex. Civ. Prac. & Rem. Code Ann. § 33.013(a) (Vernon 1997); Roberts v. Williamson, 52 S.W.3d
343, 353 (Tex. App.-Texarkana 2001, pet. granted). However, where the parental immunity doctrine
bars legal action by a child against his parents, that child's recovery from other defendants is not
reduced by his parents' percentage of negligence. See Shoemake v. Fogle, Ltd., 826 S.W.2d 933,
938 (Tex. 1992). Thus, our resolution of this issue turns on the question of whether any action
Dillon had against his parents is barred by the parental immunity doctrine.

 Parental immunity has been adopted in Texas in order to provide parents with a certain
amount of protection from litigation concerning the decisions they make in their capacity as parents. 
See Jilani v. Jilani, 767 S.W.2d 671, 671-72 (Tex. 1988). The elements of the defense of parental
immunity are as follows: (1) the plaintiff is an unemancipated minor; (2) the defendant is the
plaintiff's parent; (3) the defendant was exercising parental authority or discretion; (4) the defendant
was negligent in exercising the parental authority or discretion; and (5) the defendant's negligence
caused the plaintiff to suffer personal injury. Id. 

 The parties' contentions in the instant case related to whether Dr. and Mrs. Reynolds were
exercising parental authority or discretion. In holding that certain situations do not amount to an
exercise of parental authority or discretion, Texas courts have specifically held that the doctrine does
not apply (1) when a parent commits a willful, malicious, or intentional wrong against a child or
abandons or abdicates his parental responsibility, (2) when the act complained of arises outside of
a normal family relationship of a parent to a child, such as a business activity in which the child is
the employee and the parent is the employer, and (3) when damages are caused to the child by the
parent's negligently operating a motor vehicle. See Hall v. Martin, 851 S.W.2d 905, 909 (Tex.
App.-Beaumont 1993, writ denied). On the other hand, parents have immunity from their child's
cause of action for injuries arising out of essentially parental activities involving issues of (1)
supervision, (2) discipline, (3) provision of a home, (4) provision of food, (5) schooling, (6) medical
care, (7) recreation, and (8) family chores. See Felderhoff v. Felderhoff, 473 S.W.2d 928, 933 (Tex.
1971); see also, e.g., Shoemake, 826 S.W.2d at 936 (parental immunity applied to claim for
negligent supervision of child who drowned); Hall, 851 S.W.2d at 910 (parental immunity applied
to claim that parent was negligent in entrusting a motor scooter to child without instructions or
helmet); Hoffmeyer v. Hoffmeyer, 869 S.W.2d 667, 668 (Tex. App.-Eastland 1994, writ denied)
(parental immunity applied to claim that parent was negligent in supervising child when parent left
loaded gun in the room). 

 Surplus Sales argues that the facts of the case at hand are analogous to damages that are
caused to a child by the parent's negligently operating a motor vehicle. We disagree and decline to
so extend that exception to parental immunity. In Jilani, the court specifically limited its holding
to the facts before it, to-wit: "an automobile tort action brought by an unemancipated minor child
against a parent." Jilani, 767 S.W.2d at 673; see  Weiner v. Wasson, 900 S.W.2d 316, 319 (Tex.
1995). The facts in the instant case, we conclude, fall within the scope of the reasonable exercise
of parental authority and ordinary parental discretion. The record reflects that Dr. Reynolds was
holding Dillon between his legs to prevent him from running about the premises. Dr. Reynolds's
actions involved the supervision of Dillon and, as such, the parental immunity doctrine applies. We
hold that the trial court did not err in refusing to reduce Dillon's damages to correlate to the
percentage of Surplus Sales's negligence. Surplus Sales's seventh issue is overruled.


Conclusion

 Having overruled Surplus Sales's issues one, two, three, four, seven and nine, we affirm the
judgment of the trial court in part. However, since we have sustained Surplus Sales's issue six, we
reverse and render as to the $50,000 awarded to Dillon Reynolds for past physical impairment and
reform the judgment to reflect that Reynolds take nothing with regard to damages awarded for Dillon
Reynolds's past physical impairment.


 SAM GRIFFITH 

 Justice



Opinion delivered July 16, 2003.

Panel consisted of Worthen, C.J., Griffith, J., and Ramey, Retired Chief Justice, Twelfth Court of Appeals, Tyler, sitting
by assignment.








(PUBLISH)
1. In its reply brief, Surplus Sales waived issues five and eight.
2. The record reflects that Barry Lee Richard weighed these mirrors and determined that each mirror
weighed thirty pounds.
3. Dr. Reynolds's testimony reflects that Mrs. Reynolds could not move the stack of mirrors off of him and
that the mirrors had to be removed one by one. Ultimately, D.S. Jones ("Jones"), the owner of Surplus Sales, and
two other men had to assist in order to remove Dillon and Dr. Reynolds from beneath the stack of mirrors.
4. Dr. Reynolds testified that oral surgery is his greatest strength.
5. When Dr. Reynolds began practicing dentistry again, his patients were residents of a local nursing home
and required that he perform his work while they were lying in bed.
6. Dr. Reynolds testified that because the income from the chicken farm was negligible, he began to seek
work as a dentist between four and five days a week.
7. Dr. Reynolds testified that he worked one full day and two half-days per week.
8. Considering Dr. Reynolds's age at the time of trial, his remaining work life to reach age sixty-two would
be twenty-two years.
9. Considering evidence of Dr. Reynolds's actual earnings of $130,000 for the year preceding the trial of this
case, in light of an earning capacity of $208,000, Dr. Reynolds's lost earnings would be $78,000 per year. Over
twenty-two and one half years, Dr. Reynolds's lost future earning capacity damages total $1,755,000. See, e.g.
McAllister, 667 S.W.2d at 832-33.
10. The jury found Surplus Sales to be fifty percent negligent.