**Opinion filed March 11, 2010**



In The

# Eleventh Court of Appeals

_____

## No. 11-08-00097-CV

_____

## MID-CENTURY INSURANCE CO. OF TEXAS, Appellant

## V.

## SYNTHIA MCLAIN, Appellee

**On Appeal from the 42nd District Court**

**Taylor County, Texas**

**Trial Court Cause No. 45,958-A**

### M E M O R A N D U M   O P I N I O N

Synthia McLain, the insured, sued Mid-Century Insurance Co. of Texas and its agent, Larry Chapman, after her car wreck with Becky Morey. McLain had uninsured/underinsured coverage under a policy written by Mid-Century and sold to her by Chapman. McLain's lawsuit was for contractual claims under the policy and for extra-contractual and bad faith claims. The trial court granted Mid-Century's motion to sever and ordered that McLain's extra-contractual and bad faith claims against Mid-Century and Chapman be severed from the underlying car

accident claims. The extra-contractual and bad faith claims were assigned Docket No. 45,958-B. McLain's claim in this case, made pursuant to her insurance policy, was contractual in nature. *Henson v. S. Farm Bureau Cas. Ins. Co.*, 17 S.W.3d 652 (Tex. 2000); *Franco v. Allstate Ins. Co.*, 505 S.W.2d 789 (Tex. 1974). Thus, this case was to establish the contractual obligation, if any, of Mid-Century to pay under the uninsured/underinsured motorist (UIM) provision of McLain's insurance policy.

A jury found that Morey's negligence was the cause of the accident and awarded McLain $116,726: $5,000 for physical pain and mental anguish sustained in the past; $0 for pain and mental anguish in the future; $80,000 for loss of earning capacity sustained in the past; $10,000 for loss of earning capacity in the future; $500 for physical impairment sustained in the past; $0 for physical impairment that would be sustained in the future; $11,226 for medical care in the past; and $10,000 for future medical care. The trial court also awarded prejudgment interest. Morey had settled with McLain and did not participate in the trial.

After the verdict, Mid-Century put on evidence that its policy limit was $20,000, that it had made personal injury payments (PIP) of $2,500, that it had made a settlement offer of $1,500, and that McLain had received a settlement of $21,500 from Morey. At a hearing on entry of judgment, Mid-Century again urged that these amounts be taken into consideration, citing *Brainard v. Trinity Universal Insurance Co.*, 216 S.W.3d 809 (Tex. 2006); *Henson*, 17 S.W.3d 652; and *State Farm Mutual Automobile Insurance Co. v. Norris*, 216 S.W.3d 819 (Tex. 2006). Mid-Century argued that its liability under the UIM provision should not exceed $20,000, pointing out that the extra-contractual claims had been severed and were to be tried later. Despite the fact that it was her burden of proof, McLain contended that Mid-Century had not introduced McLain's policy during the jury trial and that it had failed to establish the amount of the settlement from Morey. And despite well-settled law, McLain convinced the trial court to enter judgment against Mid-Century for the entire $116,726 plus prejudgment interest. The trial court also denied Mid-Century's motion for a judgment n.o.v. and for a new trial.

Mid-Century presents four issues on appeal: that the trial court erred in entering judgment for the entire $116,726 in this first phase of a UIM case; that the evidence was legally and factually insufficient to support the award of lost earning capacity; that the evidence was legally

2

and factually insufficient to support the award of future medical expenses; and that it was incurable jury argument for counsel for McLain to argue in closing that Mid-Century and its lawyer were trying to "deceive" the jury because they believed the jury was "ignorant" and that the jury should serve as the conscience of the community. This argument was made after counsel for McLain had repeatedly injected the idea of bad faith on the part of Mid-Century during the entire trial from the time of voir dire to closing. The first, second, and fourth issues are sustained, and the case is remanded for a new trial.

*UIM Coverage*

The Texas Insurance Code requires insurers to offer Texas motorists UIM coverage and mandates that such coverage:

> [P]rovide for payment to the insured of all amounts that the insured is legally entitled to recover as damages from owners or operators of underinsured motor vehicles because of bodily injury or property damage, not to exceed the limit specified in the insurance policy, and reduced by the amount recovered or recoverable from the insurer of the underinsured motor vehicle.

TEX. INS. CODE ANN. § 1952.106 (Vernon 2009).[1]

McLain's counsel erroneously argued to the trial court, and now to this court, that it was Mid-Century's burden to introduce McLain's policy and the amount of any settlement from Morey into evidence. The long established Texas law is that a plaintiff seeking recovery against an insurance company for injuries resulting from the negligence of an uninsured motorist must plead and prove that, at the time of the accident, the plaintiff was protected by uninsured motorist coverage. *Members Mut. Ins. Co. v. Olguin*, 462 S.W.2d 348, 350 (Tex. Civ. App.—El Paso 1970, no writ); *Members Mut. Ins. Co. v. Clancy*, 455 S.W.2d 447 (Tex. Civ. App.—San Antonio 1970, no writ); *Pan Am. Fire & Cas. Co. v. Loyd*, 411 S.W.2d 557, 560 (Tex. Civ. App.—Amarillo 1967, no writ). In the retrial of this case, McLain should introduce a copy of her policy and establish her UIM coverage if she continues to contend that the policy introduced by Mid-Century was not her policy at the time.

---

[1] Article 5.06-1(5) of the Insurance Code, which was a former version of Section 1952.106, was in effect when McLain filed this suit. *See* former TEX. INS. CODE art. 5.06-1(5) (1981). However, because the legislature made no substantive changes to Article 5.06-1(5) in enacting Section 1952.106, we refer to the current statute in the body of the opinion.

Before an insured is entitled to recover under a UIM policy provision, the insured must establish the tortfeasor's liability and the damages resulting from the tortfeasor's negligence. The UIM insurer is under no contractual duty to pay benefits until the insured obtains a judgment establishing the liability and underinsured status of the other motorist. *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809 (Tex. 2006); *Henson*, 17 S.W.3d at 654.[2] A motorist is underinsured if his or her liability insurance is insufficient to pay for the injured party's actual damages. *Stracener v. United Servs. Auto. Ass'n*, 777 S.W.2d 378, 380 (Tex. 1989). Recovery from UIM coverage may be had only for damages sustained in an amount in excess of the total amount of the tortfeasor's liability coverage. Section 1952.106; *Olivas v. State Farm Mut. Auto. Ins. Co.*, 850 S.W.2d 564, 565 (Tex. App.—El Paso 1993, writ denied). It was McLain's burden to establish these elements to prove that Morey was at fault and underinsured and that McLain's damages exceeded the amount recovered or recoverable from Morey.

McLain argues that Mid-Century was required to plead, as affirmative defenses, policy limits and any offset such as Morey's coverage limits and Mid-Century's PIP payments. For her position, McLain cites *Southwestern Fire & Casualty Co. v. Larue*, 367 S.W.2d 162 (Tex. 1963). However, *Larue* involved an action on a promissory note against the maker of the note. McLain's citation of *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931 (Tex. 1980), and TEX. R. CIV. P. 94 on affirmative defenses is also not in point. McLain has confused a contractual condition precedent with an affirmative defense. The court of appeals in *Henson* held that the specific language in insurance contracts – "legally entitled to recover" – creates a condition precedent to a contractual obligation by insurance companies to perform under a UIM provision. *Henson v. Tex. Farm Bureau Mut. Ins. Co.*, 989 S.W.2d 837, 839 (Tex. App.—Amarillo 1999), *aff'd*, 17 S.W.3d at 654. It was McLain's burden to satisfy the condition precedent by establishing that she was "legally entitled to recover" damages from Morey and that Morey was an underinsured driver.

---

[2]If the insured proceeds against the uninsured motorist without the consent of the insurance company, the judgment in that case will not be conclusive; the liability of the uninsured motorist and damages will have to be relitigated in the suit against the insurance company providing the uninsured/underinsured coverage. *Criterion Ins. Co. v. Brown*, 469 S.W.2d 484, 485 (Tex. Civ. App.—Austin, writ ref'd n.r.e.).

After the jury verdict, Mid-Century correctly established that it had paid PIP benefits and made a settlement offer to McLain. As pointed out in *Brainard*, those amounts are to be taken into consideration in determining the amount of prejudgment interest (that would have been owed by the underinsured motorist) under the "declining principal" formula. *Brainard*, 216 S.W.3d at 816. In *Brainard*, the supreme court held that UIM insurance covers prejudgment interest that the underinsured motorist would have owed to the insured and that prejudgment interest constitutes part of the damages caused by the underinsured motorist. On the other hand, the supreme court in *Henson* held that, because UIM insurers do not breach their contractual obligation to pay until tort liability is established, prejudgment interest against the UIM insurer does not begin running until the liability of the uninsured/underinsured motorist is established. *See also Menix v. Allstate Indem. Co.*, 83 S.W.3d 877 (Tex. App.—Eastland 2002, pet. denied).

McLain attempts to distinguish *Brainard*, *Henson*, and *Nationwide Mutual Fire Insurance Co. v. Voight*, 971 So. 2d 239 (Fla. Dist. Ct. App. 2008), the cases cited by Mid-Century, by arguing that in this case Mid-Century undertook the defense of Morey and thereby undertook a duty to plead and prove the amount of money paid by Morey or her insurer and a duty to plead and prove McLain's UIM coverage. We disagree. Mid-Century simply put McLain to her burden of proof that she had to establish a contractual obligation of Mid-Century to pay an amount under the UIM provision.

The trial court erred in entering judgment against Mid-Century for $116,726. Despite McLain's failure to introduce the policy, Mid-Century did introduce a copy of the policy with its provision for $20,000 in UIM benefits. At the outset of trial, counsel for McLain told the court that the underinsured motorist had paid McLain $20,100, that Mid-Century had paid her $2,500 in PIP benefits, and that the UIM limit in her policy was $20,000. The judgment against Mid-Century should not have exceeded $20,000. Mid-Century's first issue is sustained. We turn next to McLain's burden of proof on her damages from Morey's negligence. McLain had the burden to establish that her damages exceeded $22,600 ($20,100 settlement from Morey and $2,500 PIP benefits from Mid-Century).

5

*Loss of Earning Capacity*

In its second issue, Mid-Century argues that the evidence was legally and factually insufficient to support the jury award of $80,000 for past lost earning capacity and $10,000 for future lost earning capacity.

Loss of earning capacity is the plaintiff's diminished capacity to earn a living. *See Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 35 (Tex. App.—Tyler 2003, pet. denied); *Koko Motel, Inc. v. Mayo*, 91 S.W.3d 41, 51 (Tex. App.—Amarillo 2002, pet. denied). Loss of earnings is the loss of actual income due to an inability to perform a certain job that the person held before the injury. *Reynolds*, 127 S.W.3d at 35. Loss of earning capacity is the proper measure of damages, not loss of earnings, because even an unemployed person can recover for lost earning capacity. *Id.* However, evidence of loss of earnings is admissible to establish loss of earning capacity. *Id.* at 35-36. When a plaintiff is employed at the time of his or her injury, the extent of his or her loss can best be shown by comparing his or her actual earnings before and after the injury. *See Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 436 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

McLain had the burden to introduce evidence from which a jury could reasonably measure in monetary terms her earning capacity prior to the injury. *Strauss*, 67 S.W.3d at 435. Although the amount of damages resulting from impairment of a plaintiff's earning capacity is largely within the discretion of the jury, the jury should not be left to mere conjecture when facts appear to be available upon which the jury could base an intelligent answer. *Id.* The damages need to be proved with that degree of certainty of which the case is susceptible. *Id.* at 436.

Mid-Century correctly states that McLain was required to prove (1) her earning capacity before the accident in April 2003 and (2) her earning capacity after the accident and before trial in November 2007, as well as her earning capacity in the future. Mid-Century concedes that there was some evidence through McLain's testimony as to the first element, but contends that evidence of the second element was lacking.

McLain testified that, before the accident, she worked forty hours a week at $10 an hour as an office aide for Hibbs & Todd, a civil engineering company. Her duties included filing and making copies of manuals that went with blueprints to the job site. In addition, she said that she

6

worked "approximately eighteen hours a week at the Buffalo Gap Store." There, she made $6 an hour. McLain stated that her back pain became unbearable because both jobs kept her on her feet most of the time. According to McLain, "very shortly after the wreck [she] ended up leaving the Buffalo Gap store." She believed that she left Hibbs & Todd during the first part of 2004, but she "would have to check to make sure." Her testimony was evidence of her earning capacity before the accident, but it was not the degree of certainty of which this case was susceptible. McLain could have easily provided her form W-2s from her employers, statements from her employers, and her tax returns.

If one assumes that McLain worked forty hours a week every week for Hibbs & Todd and eighteen hours a week every week for the Buffalo Gap store, she would have earned $508 per week or $26,416 per year. McLain acknowledged that she did not work forty hours a week every week for Hibbs & Todd because sometimes she was sick, had to take care of her children, or took time for a vacation.

Within a few weeks of leaving Hibbs & Todd, McLain took a job as a substitute teacher at the Jim Ned school. As a substitute teacher, she earned $50 per day. There is no evidence on how often she worked as a substitute teacher; but, apparently, she had the capacity to earn $250 per week if substitute teacher jobs were available. Subsequently, although the record does not reflect when, she became a teacher's aide at $7 an hour, working from "8:30 in the morning to 3:30 in the afternoon." She was a teacher's aide from April 2004 until May 2007, working forty hours a week. McLain said that she also tutored students for $7 an hour for about five hours a week for three months during the summers of 2005 and 2006. She also worked at Albertson's for either $6.50 or $6.75 an hour for "between 14 and 21" hours a week. At the time of trial, McLain was a full-time student at Abilene Christian University with one year left to obtain a degree in special education. From her testimony, it appears that she continued to work as a bus driver and at Albertson's to help her husband support their family.

We are unable to determine from the record how the jury arrived at $80,000 for past loss of earning capacity or $10,000 for future loss of earning capacity. Apparently, she wanted to stay with Hibbs & Todd, a job that she described as a good one with benefits. However, she could not because of her back pain. But even if we assume that she earned $508 per week before

the accident, it is not clear how much she earned or had the capacity to earn after the wreck. Also, the $508 per week was based on her working fifty-eight hours a week. After McLain left Hibbs & Todd, a number of her jobs appear to have been at $7 per hour or $280 for a forty-hour week. She testified that she left Hibbs & Todd sometime during the first part of 2004. The difference between $508 and $280 per week is $228 less earnings per week. Assuming she left Hibbs & Todd in January 2004, there were approximately 204 weeks between that date and the date of trial in November 2007. Multiplying $228 times 204 weeks yields $46,512, a number far short of the $80,000 jury verdict. There is, of course, insufficient evidence to even support a verdict in the $40,000 range because there was no evidence as to how many hours she actually worked before the wreck and how many hours she worked after the wreck, much less any other evidence of loss of earning capacity.

The record does not reflect how the jury arrived at $10,000 in future loss of earning capacity. McLain acknowledged that, after she is a college graduate, she will have an opportunity for greater earnings.

There was a lack of medical evidence as to McLain's loss of earning capacity. McLain testified that Dr. Daniel L. Munton did not take her off work because she requested that he not do so. She further testified that, after the procedure by Dr. Munton, she felt like "her old self" for a period. In his deposition, Dr. Munton stated, "No, I didn't recommend light duty. I just recommended avoiding aggravating activity." Dr. Munton specializes in physical medicine and rehabilitation; he treats people who want to avoid surgery.

From the record, it appears that McLain suffered a loss of earning capacity for some period. She should be commended for her decision to obtain a college degree; however, loss of earnings due to her decision to pursue a college degree was not a loss of earning capacity. There is insufficient evidence in the record to support the awards of $90,000 for loss of earning capacity. Mid-Century's second issue is sustained.

*Future Medical Expenses*

Dr. Munton testified that McLain underwent a procedure, known as a medial branch block, where he tried to determine where her pain was coming from. That procedure uses needles up to eight inches long to inject a numbing medicine called Marcaine. After a few days,

8

when her pain returned to the pre-injection level, Dr. Munton then determined that McLain needed to undergo a procedure termed "radiofrequency lesioning," which he described as being similar to cauterizing the nerves that appeared to be causing the pain. That procedure also utilized lengthy needles and was described by McLain as being quite painful. McLain had that procedure performed on October 2, 2003.

McLain returned to Dr. Munton on November 24, 2003, and on December 22, 2003, and said that she felt pain in a different location. Dr. Munton gave her the option of therapy, chiropractic treatment, or medication, which she chose. At the time of his deposition in 2006, Dr. Munton had not seen her since 2003 because he had moved to another city. Before the trial, he had returned to Abilene. During his deposition, he testified that some patients will have their pain return but that sixty to seventy percent of patients after a year are pain free or continue to have reduced symptoms.

To sustain an award of future medical expenses, the plaintiff must present evidence to establish that, in all reasonable probability, future medical care will be required and the reasonable cost of that care. *See Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). The reasonable value of future medical expenses may be established by evidence of the reasonable value of past medical expenses of a similar nature. *See City of Rosenberg v. Renken*, 616 S.W.2d 292, 293 (Tex. Civ. App.—Houston [14th Dist.] 1981, no writ). The preferred method of establishing future medical expenses is through expert testimony, but such testimony is not required. *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 426-27 (Tex. App.—Eastland 2006, no pet.).

Dr. Munton did not address whether in all probability McLain will need future medical care, the type of care that would be required, and the reasonable cost of that care in the future. As to future treatment, Dr. Munton stated that McLain might develop conditions that require surgery but that "[i]t would be unlikely in her case." He repeated again that he could not recommend any kind of surgical procedure, and his opinion was there was no need for spine surgery. McLain testified that she anticipated having to have the cauterization process again in the future because the nerves grow back and have to be cauterized.

9

According to the medical records, Dr. Munton did see McLain again in January 2007. Dr. Munton wanted to determine the source of her pain by again performing a medial branch block and having an MRI done, but McLain thought these were unnecessary. They agreed that she would again have another radio frequency medial branch neurotomy that utilized the 3½ inch radio frequency spinal needle. Subsequent to the procedure, Dr. Munton noted in February that McLain appeared to be "doing remarkably well." But on June 7, 2007, McLain again visited Dr. Munton and told him that her pain level had increased to level five. Dr. Munton described her condition as chronic, implying that she might have to undergo the procedure again in the future. This confirmed McLain's testimony that she thought her nerves would grow back and that she would need further treatments in the future. In 2007, McLain's medical expenses for the treatment were approximately $1,200. After reviewing the records of the costs for the injections, office visits with Dr. Munton, another possible medial branch block, and physical therapy, we cannot say that the jury's finding of $10,000 for future medical expenses was not supported by sufficient evidence. Mid-Century's third issue is overruled.

*Improper Jury Argument*

In its fourth issue, Mid-Century argues that counsel for McLain engaged in improper jury argument. To obtain reversal of a judgment on the basis of improper jury argument, Mid-Century must prove (1) an error (2) that was not invited or provoked; (3) was preserved at trial by a proper objection, motion to instruct, or motion for mistrial; and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979). Our review of an improper jury argument claim must cover the entire case, beginning with voir dire and ending with closing argument. *Id.* at 840. The complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the evidence. *Id.* at 840.

At the pretrial conference, counsel for Mid-Century requested that the trial court explain (or allow him to explain) at the outset to the jury the nature of the case and the posture of the case. He stated that a brief statement would give the jury the context of the case and explain why Morey, the underinsured driver, was not present and McLain's insurance company was the

10

defendant. The trial court denied this request. However, the court did allow Mid-Century to state during voir dire that this case was not about how the claim was handled but was about the liability of Morey and the damages that resulted from the accident McLain had with Morey.

One of the first statements by McLain's attorney to the jury on voir dire was, "We find ourselves in an odd situation in that Mrs. McLain's own insurance company is fighting against her." The court sustained Mid-Century's objection, but moments later, McLain's counsel continued, "[E]ven though it's against her own insurance company, she has to prove and can only recover money." Then, the following occurred:

> [T]his lawsuit has been here for three-and-a-half years. The wreck has been -- it happened four-and-a-half years ago, and within the last week they say for the first time it's her fault. Who thinks that's right? If you do, raise your hand and let's talk about that. Do you think that an insurance company owes better to their insured than that?
>
> . . . .
>
> VENIREPERSON: Yes.
>
> MR. BURNETT: If they think that her injuries were caused by something else don't you think within four-and-a-half years they ought to bring a doctor, any doctor --

Counsel for Mid-Century again objected, and the trial court sustained the objection. Counsel for McLain continued during voir dire to allude to the insurance company as being in bad faith even though this case was solely about the negligence of Morey and damages caused by her negligence. McLain's bad faith claims had been severed into a separate case and were not involved in this case.

Questions by the venire panel indicate the effect counsel for McLain had on the panel. One venireman asked counsel for Mid-Century, "But what about when the lady -- y'all decided not to pay her, didn't you?" Counsel for Mid-Century answered, "No," but counsel for McLain immediately said, "I object to that. That's not true." When the venireperson continued with, "My question is, someone somewhere had already had to resolve the evidence to not pay her; the insurance company," the court intervened and said, "Well, that's what the lawsuit is about." The court's statement was not helpful. The venireperson may have interpreted the court's statement

11

to mean that the lawsuit was over whether the insurance company had in bad faith failed to pay an amount that it owed, not that it was a lawsuit to determine whether the insurance company had any obligation at all under the UIM provision.

In opening statement, counsel for McLain continued the same tactic that he pursued during voir dire:

> [T]here aren't any other doctors to indicate otherwise, and yet here we are on her uninsured underinsured claim with this company and they haven't paid a penny.

Counsel for Mid-Century again objected, stating that Mid-Century had no obligation to pay at this point and that counsel's statements were prejudicial and had no relevance to this case. The court sustained the objection, telling counsel, "Do not do that again." The court instructed the jury to disregard counsel's statement, but overruled Mid-Century's motion for a mistrial.

McLain's counsel asked the investigating officer, "Did any of these artful questions by this lawyer here change your opinion of who caused the wreck?" Mid-Century's objection was sustained.

In questioning McLain, her counsel continued in the same vein:

> When was the first time that you heard this company, your insurance company, say that this wreck was your fault?
>
> . . . .
>
> You have been telling this company that you were hurt, that it wasn't your fault, for four-and-a-half years, right?

Although it was McLain's burden to establish her lost earning capacity, her counsel did not produce any of her earning records. Instead, he attempted to persuade the jury that it was Mid-Century's burden to negate her testimony as to where and when she worked:

> Q. Is today the first time you have now heard they [Mid-Century] are quarreling with you over your lost earning capacity?
>
> A. Correct.
>
> Q. If we had known about that we could have brought somebody in here with those records, right?

The court sustained Mid-Century's objection, but counsel's next questions were:

> Q. Your earning records are available and have been available to them for four-and-a-half years, haven't they?

> A. Yes.

> Q. They could have gone down to Hibbs & Todd, they could have called anybody they wanted to and they would have give them that information, right?

The court again sustained Mid-Century's objection, but counsel continued:

> Q. Has anyone asked you, with this Defendant, to produce any records up until this moment?

The court again sustained Mid-Century's objection that counsel was misleading the jury with respect to the burden of proof and with respect to the law that the jury would be guided by in making its decisions.

It is apparent from the record that counsel for McLain created the impression that Mid-Century owed duties that it did not owe and that the insurance company had acted in bad faith. Although the court sustained Mid-Century's many objections, the court's actions had little effect. In closing argument, counsel for McLain argued:

> You know now that this insurance company, that these people, paid for this coverage.

> . . . .

> No witness, no evidence, all they have is a lawyer that came down here armed with a strong desire to deceive you. . . . Does he think -- does this company think that out here in Abilene we're all so, I guess, ignorant that we can't read a doctor's order . . . ?

> [Y]ou don't have to get past tab one in the case in the medical records of the very first exhibit to see how untruthful and disingenuous these people's own insurance company is.

> . . . .

> Now, how is it that they can stand up here and say those things and expect you to be misled? . . . [T]hey have to deceive you into believing.

13

> . . . .

> We know it's been 1,672 days since this happened. We know it's been 1,672 days where this company could have stepped up to the plate and honored its responsibility, and they have failed entirely to do that.

Counsel for Mid-Century objected, and the objections were sustained, as they had been throughout the case. Counsel for McLain continued to imply that the insurance was acting in bad faith in his rebuttal argument:

> Do you really think when this insurance company is talking to people --

> . . . .

> To this insurance company that means their insured did not complain of back pain.

> . . . .

> And when you boil this case down they've got to prove she's a liar, and they can't do it and it's driving them crazy. They not only have to prove she's a liar, they have to prove the police officer was a liar. They have to prove Doctor Munton was a liar.

> . . . .

> I want you to be able to say you righted a wrong, and that as the standard bearer and setter of this community, this will not be tolerated. I look forward to your verdict.

Counsel for McLain was well aware that McLain's extra-contractual claims had been severed from this case. He points out that the court sustained Mid-Century's objections throughout the trial. It is obvious from the record, however, that the court's rulings had no effect on counsel.

In *Living Centers of Texas Inc. v. Peñalver*, 256 S.W.3d 678, 680-81 (Tex. 2008), the supreme court stated that the complaining party "must show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove its effects." Error as to improper jury argument must ordinarily be

14

preserved by a timely objection that is overruled. *Tex. Employers' Ins. Ass'n v. Haywood*, 266 S.W.2d 856, 858 (Tex. 1954). Here, however, unlike the situation in *Peñalver*, Mid-Century did object, and its objections were sustained; counsel for McLain simply ignored them.

Unsupported, extreme, and personal attacks on opposing parties can compromise the basic premise that a trial court provides impartial, equal justice. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840 (Tex. 1979). As the supreme court noted in *Peñalver*, the serious effects of arguments not based on evidence or invited by opposing counsel are recognized in our Texas Rules of Civil Procedure. Rule 269 provides that, during final arguments, "[m]ere personal criticism by counsel upon each other shall be avoided, and when indulged in shall be promptly corrected as a contempt of court." TEX. R. CIV. P. 269(e).

In this case, counsel's final arguments were made after he had consistently emphasized to the jury during the entire trial that McLain's own insurance company had acted in bad faith. That effect was not cured by the court's instruction during counsel's argument.

Counsel for McLain first argues that Mid-Century invited and provoked the argument in question because "Mid-Century waited over 3½ years until days before trial to contest liability or assert that McLain's damages resulted from a preexisting condition and then challenged the truthfulness of McLain on both liability and damages." Mid-Century had filed a general denial at the outset. It did file an amended petition just prior to trial. At a hearing on the amended petition, Mid-Century represented to the trial court that its amended petition was only based on testimony already reflected in the record. The trial court ruled that it was timely filed. Implicit in its ruling was a premise that McLain should not have been surprised by the amended petition. After reviewing the record, we find that there was no abuse of discretion in the trial court's ruling.

Counsel for McLain also argues that Mid-Century disregarded the fiduciary duties it owed to its insured by stepping into the shoes of the underinsured motorist, Morey. For this argument, counsel relies on *Allstate Insurance Co. v. Hunt*, 450 S.W.2d 668, 671 (Tex. Civ. App.—Houston [14th Dist.] 1970), *aff'd*, 469 S.W.2d 151 (Tex. 1971). In *Hunt*, the supreme court held that the trial court did not abuse its discretion in ruling that Allstate could not participate in defending the underinsured motorist. The court emphasized that Allstate had agreed to be bound

15

by the insured's suit against the other motorist and had been granted a severance of the suit against it. The supreme court reasoned that Allstate had a primary duty to its insured and that the insurance company would have conflicting duties if the "uninsured motorist should later decide to bring a cross-action against the insured motorist, the company would find itself under a duty to defend both antagonists." 469 S.W.2d at 153.

In this case, the facts are quite different from those in *Hunt*. There is no basis in the record for an argument that Mid-Century owed a fiduciary duty to McLain in this case. Shortly after *Hunt* was decided, the court in *Criterion Insurance Co. v. Brown*, 469 S.W.2d 484, 485 (Tex. Civ. App.—Austin 1971, writ ref'd n.r.e.), pointed out the choices someone in Mclain's position has:

> [The insured] may sue the insurance company directly without suing the uninsured motorist. *State Farm Mutual Automobile Ins. Co. v. Matlock*, 462 S.W.2d 277 (Tex. 1970). When the insured obtains the written consent of the insurance company, he may sue the uninsured motorist alone, and that judgment binds the insurance company. *Allstate Ins. Co. v. Hunt, supra*. The insured may proceed against the uninsured motorist without the consent of the insurance company, but the judgment in that suit will not be "conclusive," (i.e. liability and damages will have to be relitigated) in the suit against the insurance company. *Allstate Ins. Co. v. Hunt, supra*.

This is still the law. *Soliz v. Cofer*, No. 03-01-00246-CV, 2002 WL 821909 (Tex. App.—Austin May 2, 2002, pet. denied); *Gov't Employees Ins. Co. v. Lichte*, 792 S.W.2d 546, 548 (Tex. App.—El Paso 1990, writ denied).

Here, the other motorist, Morey, was not involved because she had already settled with McLain. This suit was directly against Mid-Century. Mid-Century was not defending Morey; it was putting McLain to her proof on the issues of liability and damages. This case was only a suit on a contract and similar to automobile, fire, life, theft, accident, wind, and workers' compensation insurance cases brought by an insured against its own insurer over contractual coverage. Counsel's arguments to the jury were improper and incurable by the time they were made. Mid-Century's fourth issue is sustained.

*Conclusion*

To establish her entitlement to underinsured motorist benefits, McLain was required to establish the following: (1) that she had UIM coverage; (2) that Morey's negligence caused her damages and the amount of her damages; and (3) that Morey was, in fact, underinsured. *State Farm Mut. Auto. Ins. Co. v. Grayson*, 983 S.W.2d 769 , 770 (Tex. App.—San Antonio 1998, no pet'n).

McLain did not introduce her insurance policy and failed to carry her burden of proof to establish that she had uninsured/underinsured coverage from Mid-Century. It is basic law that when one sues on a contract, that person must first establish that he or she had a contract. McLain also had the burden to provide evidence of her settlement with Morey and the limits of Morey's insurance to establish that Morey was an underinsured motorist. She failed to provide that evidence. However, Mid-Century did not contest the coverage and provided evidence to the trial court that her policy provided for $20,000 in coverage.

McLain failed to provide sufficient proof to justify the jury's award of $80,000 in loss of past earnings capacity and $10,000 in loss of future earnings capacity. Final argument by counsel for McLain apparently influenced the jury to give an award far in excess of the evidence.

It is well settled that, in this case, Mid-Century's liability for breach of contract is limited to the amount stated in McLain's contract. From the record provided by Mid-Century, it appears that amount was $20,000. On retrial, the judgment should not exceed $20,000.

*This Court's Ruling*

The judgment of the trial court is reversed, and the cause is remanded for a new trial.


TERRY McCALL

JUSTICE


March 11, 2010

Panel consists of: Wright, C.J.
McCall, J., and Strange, J.

17