**AFFIRMED and Opinion Filed January 14, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-20-00545-CV**
_____

**C.D.C., Appellant**
**V.**
**BETHANY STEWART, Appellee**

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-08108**

## MEMORANDUM OPINION

Before Justices Myers, Molberg, and Garcia
Opinion by Justice Garcia

This appeal arises from a judgment rendered on a jury verdict in a personal injury suit. The jury found that the negligence of both the plaintiff, Dusan Clark, and the defendant, Bethany Stewart, proximately caused the collision, and awarded Clark damages for past pain and mental anguish.

In three issues, Clark argues that (i) the evidence is factually insufficient to support the finding that she was negligent or that any such failure was the proximate cause of the accident and (ii) the jury's findings that she suffered no damages for past or future lost earnings or past physical impairment are against the great weight

and preponderance of the evidence. Finding no reversible error, we affirm the trial court's judgment.

## I. BACKGROUND

The accident at issue occurred on a Sunday afternoon when traffic was light and there were no weather conditions that might have impaired visibility. Clark was driving a tan Mercedes westbound on Royal Lane. Royal is comprised of three lanes in each direction, divided by a grassy median on the left and a left-turn lane for westbound traffic turning on Thackery. Stewart was driving a black Cadillac SUV northbound on Thackery Street. Stewart needed to make a phone call, so she stopped at a stop sign where Thackery terminates at Royal and activated her right turn signal. But then Stewart decided to pull into a parking lot on the north side of Royal to make her call. To do so, she attempted to turn left by crossing all lanes of east and westbound traffic on Royal. Clark did not see Stewart's SUV until it was in the westbound lanes and hit Stewart's SUV on the right front side traveling at full speed.

Clark subsequently sued Stewart for negligence, asserting that the collision was caused in part by Stewart's failure to yield the right of way. Clark sought damages for past and future lost earning capacity, physical pain, mental anguish, and physical impairment. Stewart answered, affirmatively pleading that Clark's contributory negligence was a proximate cause of the accident and any resulting injuries, and that Clark's prior or subsequent injuries contributed to any injuries or damages she claimed.

The case was tried to a jury. The jury found that both Stewart's and Clark's negligence proximately caused the accident, with sixty percent attributable to Stewart and forty percent attributable to Clark. The jury awarded Clark $2,500 for past physical pain and $5,000 for past mental anguish, but awarded no damages for future physical pain, future mental anguish, past or future physical impairment, or past or future lost earning capacity. The trial court reduced the damages in accordance with the jury's proportionate responsibility findings and entered judgment accordingly. Clark now appeals from that judgment.

## II.  ANALYSIS

### A.  Clark's Negligence

The jury found that both Clark's and Stewart's negligence proximately caused the occurrence in question and attributed sixty percent responsibility to Stewart and forty percent to Clark. Clark's first issue challenges the factual sufficiency of the evidence to support these findings.

An appellant attacking the factual sufficiency of the evidence to support an adverse finding on an issue on which she did not have the burden of proof must demonstrate that there is insufficient evidence to support the adverse finding. *Hoss v. Alardin*, 338 S.W.3d 635, 651 (Tex. App.—Dallas 2011, no pet.) In a factual sufficiency challenge, we consider all the evidence and set the verdict aside only if the evidence supporting the jury finding is so weak or so against the overwhelming

weight of the evidence that the finding is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

There were five sources of evidence concerning the accident: Clark's testimony, Stewart's testimony, the accident report, and the testimony of two eyewitnesses, William Solari and Cynthia Cochran. Clark insists this evidence is "too sparse" to support negligence or proximate cause because it conclusively establishes that Stewart had a duty to yield and did not do so, Clark had the right of way and did not violate a statute or rule of the road, and Clark and Stewart did not see each other until the time of impact. Stewart maintains that even though Clark had the right-of-way, she nonetheless had a duty to keep a proper lookout for her own safety.

All drivers owe "a general duty to exercise the ordinary care a reasonably prudent person would exercise under the same circumstances to avoid a foreseeable risk of harm to others." *See Segura-Romero v. Castineira*, No. 01-19-00147-CV, 2020 WL 2988371, at *4 (Tex. App.—Houston [1st Dist.] June 4, 2020, no pet.) (mem. op.). This includes the general duty to keep a proper lookout. *Kahng v. Verity*, No. 01-07-00695-CV, 2008 WL 2930195, at *4 (Tex. App.—Houston [1st Dist.] July 31, 2008, no pet.) (mem. op.); *Montes v. Pendergrass*, 61 S.W.3d 505, 509 (Tex. App.—San Antonio 2001, no pet.). A proper lookout requires a person "to see what a person in the exercise of ordinary care and caution for the safety of herself and others would have seen under like circumstances," taking steps "to guard against

–4–

accidents as necessary." *Montes*, 61 S.W.3d at 509 (internal quotation omitted). "The duty to keep a proper lookout encompasses the duty to observe, in a careful and intelligent manner, traffic and the general situation in the vicinity[.]" *Carney v. Roberts Inv. Co*., 837 S.W.2d 206, 210 (Tex. App.—Tyler 1992, writ denied). Although a driver is not required to anticipate negligent or unlawful conduct by others, a driver may not close their eyes "to that which [is] plainly visible and which would have been observed by a person of ordinary prudence similarly situated." *Montes*, 61 S.W.3d at 509 (internal quotation omitted). "[P]roper lookout is ordinarily a question for the jury." *Jameson v. Melton*, 366 S.W.2d 115, 118 (Tex. App.—Dallas 1963, no writ).

The accident report admitted into evidence reflects that, prior to the accident, Clark was traveling westbound in the far-right lane of Royal Lane, and Stewart was stopped at a stop sign at the point where Thackery Street terminates at Royal. The speed limit was thirty-five miles per hour. The officer's diagram reveals the only traffic control device at that intersection was the stop sign controlling Stewart's northbound progress; and that there was no sign or signal controlling Clark's westbound travel on Royal. The report indicates that Stewart failed to yield right of way from a stop sign and traveled north across the intersection with the intent of entering a private drive on the north side of the intersection.

Stewart confirmed that after stopping at the intersection of Royal and Thackery, she attempted to cross the seven lanes of traffic on Royal so that she could

enter the church parking lot on the north side of Royal. She admitted that she had a duty to yield to the traffic on Royal and she did not do that. She further admitted the accident would not have happened but for her failure to yield the right of way. Stewart testified she never saw Clark before the collision.

Solari testified that the accident occurred early on a Sunday afternoon when traffic was light. He was a passenger in the front seat of a vehicle in the center lane approximately 25-75 yards behind Clark.[1] When Stewart's vehicle approached Clark's, Clark made no attempt to slow down or stop. Solari said there was nothing unusual about Stewart's speed as she crossed Royal Lane.

On direct examination, Solari said that once Stewart decided to come across seven lanes of traffic, Clark had no time to avoid the accident. Later he said that he was shocked that neither Clark nor Stewart attempted to slow down or stop. He believed that Clark should have seen the SUV from her vantage point, and he was unaware of any reason why Clark and Stewart couldn't see each other. When asked about Clark's failure to slow down or stop, he explained that Clark could not do so "in the distance between the two cars impacting." He also said that Clark could have tried to turn or avoid the accident, but he did not think she could have done so safely. Within a split second of the impact, Solari exclaimed, "Oh, my God, she's going to hit that car." He described the accident as a violent, high-impact wreck that was

---

[1] When deposed five years before trial, Solari said his vehicle was approximately fifty to seventy-five yards behind Clark's. At trial, his estimate was twenty-five yards.

–6–

shocking because nobody seemed to be taking any measures to avoid it. When asked: "Would you agree with me that both drivers need to try to avoid this accident?" Solari responded affirmatively. He further agreed that all drivers have a reciprocal duty to take due care for themselves and the safety of others, and here, "both could have tried to avoid the accident."

The parties differ on the conclusions to be drawn from Solari's testimony. Understandably so, because it is somewhat equivocal. According to Clark, the jury could not have concluded that she was a cause-in-fact of the accident because Solari's testimony that she could have tried to avoid the accident does not contradict his testimony that she did not have time to do so. But we must assume that the jurors resolved all conflicts in accordance with their verdict. *City of Keller*, 168 S.W.3d at 820. "Even if the evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible." *Id*. at 821.

More than one inference is possible here. Although the jury may have concluded that Clark had no time to avoid the accident once Stewart was in her lane, they could also have concluded that Clark could have avoided the accident had she maintained a proper lookout before Clark was in her lane. Cochran's testimony as well as Clark's, further supports this inference.

Cochran was behind Stewart's vehicle when she stopped at the stop sign on Thackery street. Although Stewart had her right turn signal on, she went straight across the intersection moving slowly. Specifically, Cochran estimated that Stewart

was traveling about five miles per hour. Cochran had no idea why Clark would not have seen Stewart approaching from her left; nothing would have impaired Clark's view, the SUV was traveling slowly, and it was a "big black car." Cochran does not know what lane Clark's Mercedes was in because she did not see the Mercedes until the point of impact. But she thought it was "weird" that Clark did not slow down or stop to avoid the accident.

Clark testified that she did not see Stewart's SUV until it was in the westbound lanes and there was nothing she could do. She agreed that nothing prevented her from seeing Stewart's SUV come across the intersection, and she did not know what prevented the two of them from seeing each other in time to avoid the accident.

Guided by the axiom that we cannot substitute our opinion for that of the jury's simply because we might have weighed the evidence differently, we conclude that the jury's negligence and proportionate responsibility findings are not so weak or against the overwhelming weight of the evidence as to be clearly wrong and unjust. Clark's first issue is resolved against her.

## B.     Damages for Lost Earning Capacity

Clark is an intellectual property transactional lawyer employed by a large multinational law firm. In her second issue, she argues that the jury's failure to find damages for past or future lost earning capacity is against the great weight and preponderance of the evidence. According to Clark, there is objective, uncontroverted evidence that she suffered measurable lost earning capacity because

(i) she missed time from work; (ii) it is more mentally and physically taxing for her to perform at the level she could before the accident; and (iii) because of her reduced capacity she is unable to maintain her high level of productivity for partnership eligibility and she will never be able to achieve such productivity in the future. Clark acknowledges that her partnership potential was hotly contested, but even if the jury did not believe this aspect of her claim, they could not ignore that she missed time from work. Stewart responds that Clark's argument is premised on the jury believing that Clark suffered injury and that Clark provided no evidence from which the jury could calculate the value of lost days from work and decreased performance.

When a party attacks the factual sufficiency of the evidence to support a finding on an issue as to which it had the burden of proof, it must show that the adverse finding is against the great weight and preponderance of the evidence. *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 722 (Tex. App.—Dallas 2011, pet. denied). "A finding is against the great weight and preponderance of the evidence if it is clearly wrong, manifestly unjust, or 'shocks the conscience.'" *Wal-Mart Stores Tex., LLC v. Bishop*, 553 S.W.3d 648, 663 (Tex. App.—Dallas 2018, pet. granted, judgm't modified w.r.m.) (quoting *Golden Eagle Archery v. Jackson*, 116 S.W.3d 757, 761(Tex. 2003)).

The jury is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle*, 116 S.W.3d at 761; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). The jury may believe one

witness and disbelieve another and resolves any inconsistencies in any witness's testimony. *City of Keller*, 168 S.W.3d at 819; *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986). A reviewing court may not impose its own opinion to the contrary. *City of Keller*, 168 S.W.3d at 819; *Golden Eagle*, 116 S.W.3d at 76.

Lost earning capacity is an assessment of the plaintiff's capacity to earn a livelihood prior to injury and the extent to which the injury impaired that capacity. *Scott's Marina at Lake Grapevine, Ltd. v. Brown*, 365 S.W.3d 146, 158–59 (Tex. App.—Amarillo 2012, pet. denied). This measure of damages is not assessed according to what a person actually earned before the injury but by the person's capacity to earn, even if she had never worked in that capacity in the past. *Id.*; *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 553 (Tex. App.—Fort Worth 2006, pet. denied). Loss of future earning capacity is the plaintiff's diminished capacity to earn a living after trial. *Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 35 (Tex. App.—Tyler 2003, pet. denied). Proof of lost earning capacity is always uncertain and is left largely to the jury's discretion. *Rigdon Marine Corp. v. Roberts*, 270 S.W.3d 220, 232 (Tex. App.—Texarkana 2008, pet. denied).

To support an award for damages for lost earning capacity, the plaintiff must present evidence sufficient to permit a jury to reasonably measure earning capacity in monetary terms. *Tagle v. Galvan*, 155 S.W.3d 510, 519–20 (Tex. App.—San Antonio 2004, no pet.). Non-exclusive factors to consider include evidence of past earnings and the plaintiff's stamina, efficiency, ability to work with pain, and work-

life expectancy. *Big Bird Tree Servs. v. Gallegos*, 365 S.W.3d 173, 178 (Tex. App.—Dallas 2012, pet. denied). There must be some evidence that the plaintiff had the capacity to work prior to the injury and that that capacity was impaired as a result of the injury. *Plainview Motels*, 127 S.W.3d at 36.

1.     Past Lost Earning Capacity

Because recovery for lost earning capacity turns on whether the earning impairment resulted from the claimed injury, we begin with Clark's evidence of injury. *See id*. Clark began having migraines when she was in college, and they increased when she started practicing law in the early 2000's. The migraines could last for hours or a day. She has missed work because of her migraines but it did not affect her job performance.

Clark consulted a neurologist about the migraines about twelve years before the accident. The neurologist, Dr. Steven Herzog, did not testify at trial, but his records were admitted into evidence.

Prior to the accident, Clark regularly saw Dr. Mary Warren, a chiropractor, and was treated for fatigue, headaches, and neck pain. The severity of these symptoms varied, and on some visits Clark's pain level was a seven, eight, or nine on a one to ten scale. She often complained of feeling "tired," "drained," "frazzled," "stiff," or "sore." Clark also suffered from insomnia and problems waking. Her complaints were worsened by job-related stress, increased demands, and lack of sleep and were made better by massage and less stress.

Clark went to the emergency room three hours after the accident. She was diagnosed with a forearm contusion, a shoulder sprain, and a foot sprain, and was discharged after about an hour.

The next day, Clark visited Dr. Warren and said she injured her neck. Three days later, she complained that she was "groggy," and had headaches and difficulty focusing. Dr. Warren ordered a brain MRI; the results were unremarkable (normal). About six weeks after the accident, Dr. Warren noted that Clark was under her care for whiplash from a motor vehicle accident, but had been re-evaluated, and could return to work full-time.

Clark saw Dr. Herzog about a month after the accident complaining of memory loss and visual disturbances. Clark was referred to an eye doctor for the visual disturbances.[2] Dr. Herzog performed a neurological exam, and all findings were normal. Clark was diagnosed as having "a concussion with post-traumatic headaches, cognitive deficits, pronounced fatigue, and dizziness." According to Dr. Herzog's notes, Clark returned to work three days after the accident. After examining Clark, he wrote a note stating that Clark's post-concussive symptoms necessitated reduced work hours for a month. Less than a month later, Clark returned to Dr. Herzog and reported that her headaches, concentration, and focus had improved, and she had returned to work full-time.

---

[2] The eye doctor's records were admitted into evidence.

When Clark saw Dr. Herzog again three months later, she said she believed her headaches were triggered by stress and emotion. Clark said, "I'm a lawyer, and this comes with the job." Although Clark said her memory had improved, it was not back to baseline. Herzog's examination of Clark showed that Clark's language, memory, attention, concentration, and "fund of knowledge" were all normal.

Two months later, Clark told Dr. Herzog that her headaches had improved, and she was "doing great." She had no cognitive complaints, and her neurological exam was normal. But on a subsequent visit several months later, she told the doctor that she occasionally struggled with word finding and tired easily after long hours at work. Clark reported that her headaches were unchanged and "stress is a significant factor." Herzog's exam during that visit showed that Clark's language, memory, attention, concentration, and fund of knowledge were all normal.

Clark also continued to see Dr. Warren after the accident for the same reasons she saw her before the accident, including stress, fatigue, headaches, neck aches, and low back issues.

Four years later, Clark's attorney's retained Dr. Arthur Joyce, a neuropsychologist, to perform a forensic evaluation for the lawsuit. Dr. Joyce did not review any of Clark's pre-accident records, but he did review post-accident records, including those of Dr. Herzog, the hospital emergency room, and the eye doctor.

Dr. Joyce did not diagnose Clark with a concussion or head injury but noted that Dr. Herzog diagnosed a concussion three weeks after the accident. He acknowledged that post-concussive symptoms often go away within weeks or months. Dr. Joyce also agreed that Clark's MRI was normal, as were all the neurological tests Dr. Herzog performed. Nonetheless, he opined that the normal MRI does not mean a head injury is less significant or severe. Head injuries are typically diagnosed by a neurologists based on symptoms.

Dr Joyce interviewed Clark and her boyfriend. Clark reported that she experienced mood and behavioral changes and tends to be under a lot of stress. Dr. Joyce also administered neuropsychological tests and had Clark complete some rating scales. He also looked at Clark's general personality and psychopathology.

The tests showed deficits in Clark's working memory index. Dr. Joyce opined that these deficits are not likely to improve in the future and are likely associated with brain injury. Clark also showed problems with "shifting attention," which is the ability to shift from one problem solving idea to another one. There were also deficits in long-term memory, visual memory, and verbal memory. Dr. Joyce admitted that symptoms such as confusion and forgetfulness can be caused by other factors and stress could impact test performance. He further acknowledged that Clark has a history of sleep issues, but he did not ask how much sleep she had the night before the test.

When asked about the eye doctor's notation that Clark suffered a "TBI," Dr. Joyce explained that TBI stands for traumatic brain injury. He would not expect someone with a mild TBI to be unable to work anymore, but that individual would have deficits that would affect quality of life. As for Clark, Dr. Joyce reported that she does not interact socially like she used to because she is sensitive to noise. The doctor further opined that Clark's effort to continue to perform at work is "quite exhausting for her." Ultimately, Dr. Joyce concluded that Clark would benefit from a course of cognitive rehabilitation and psychotherapy but did not know if she followed up on his recommendation.[3]

Clark's boyfriend testified about how the accident impacted Clark's life. After the accident, Clark began experiencing speech and memory problems. At the time of trial, Clark's cognitive deficits had diminished, but had not disappeared. Clark was more social before the accident, but now spends her downtime quietly at home. It takes Clark longer to do her work and maintain the intensity required at her job.

Clark testified that she is "not incapacitated," and has not seen anyone for treatment since 2015. Nonetheless, she struggles with cognitive problems that prevent her from making partner at her firm. According to Clark, she suffered a concussion that affects how she lives her life, including how she practices law. She

---

[3] Clark testified that she did not follow up because her attorneys did not tell her about Dr. Joyce's recommendations. Moreover, Dr. Joyce's treatment would involve coping skills and she has already figured out how to cope.

does not claim personality changes, emotional issues, neck problems, or migraines prevent her from doing her the extra tasks required for partnership. Rather, her brain injury prevents her from doing these extra things.

Clark is happy with her firm and is still a great, productive lawyer. She works on approximately seventy different matters a month, in a detail-oriented job requiring extensive analysis. Despite attention-shifting test scores, she is praised for being able to juggle things.

Clark said she has good days and bad days; her occasional problems "are not in [her] everyday life." Nonetheless, it is harder to do her job. To this end, Clark testified that "it's everything I can do to keep up the quality of work and the productivity, and those deficits make it more challenging." Although she still goes to an occasional dinner, she spends a lot of her non-work time at home resting and recharging.

Dr. Jed Falkowski, a neuropsychologist, testified for Stewart based on a review of Clark's records. According to Dr. Falkowski, the records from the day of the accident did not provide any objective support for a TBI or concussion, and Clark's symptom onset and progression was inconsistent with the typical pattern of presentation following a TBI or conclusion. Dr. Falkowski opined that Clark's symptoms are not reasonably tied to a remote brain injury, and can be explained by other things, such as migraines, sleep issues, stress, and depression.

Dr. Falkowski noted that Clark's employee performance records show that she was functioning at an extremely high level the year following the accident, and this is inconsistent with Dr. Joyce's finding concerning her working memory. Dr. Falkowski opined that "[t]here's not objective evidence from the day of the accident of an injury. In the testing performed four years later, it appears to be impacted—it was likely impacted by other factors."

As Clark acknowledges, it is within the province of the jury to believe one witness and disbelieve another. "When a jury is presented with conflicting evidence about the existence and severity of a physical injury and associated pain, the jury 'could believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness.'" *Golden Eagle,* 116 S.W.3d at 774 (quoting *Pilkington,* 822 S.W.2d at 230). A jury may also conclude, even when an objective injury is shown, that the injury is attributable to factors other than a defendant's negligence. *McDonald v. Dankworth*, 212 S.W.3d 336, 349 (Tex. App.—Austin 2006, no pet.).

Nonetheless, Clark argues that despite the jury's latitude to assess the severity of her injuries, they could not ignore that she missed time from work due to the accident and were provided with evidence approximating the time and a basis to calculate that time. Clark's argument is misplaced.

Arguing that Clark was entitled to damages because she missed time from work confuses the idea of past lost earnings with loss of earning capacity. Past lost

earnings are the actual loss of income due to the inability to perform a specific job. *Border Apparel East, Inc. v. Guardian*, 868 S.W.2d 894, 897 (Tex. App.—El Paso 1993, no writ). This differs from loss of earning capacity. *Id*; *Metropolitan Life Ins. v. Haney*, 987 S.W.2d 236, 244 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). Loss of past earning capacity is the plaintiff's diminished earning power or capacity directly resulting from the injuries sustained. *Strauss v. Continental Airlines, Inc.*, 67 S.W.3d 428, 435 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Recovery for lost earning capacity, past or future, is not based on actual earnings lost, but rather on the capacity to earn money. *See Brazoria County v. Davenport*, 780 S.W.2d 827, 832 (Tex. App.—Houston [1st Dist.] 1989, no writ).

This case was submitted to the jury on "loss of earning capacity in the past." In other words, the jury was asked to determine whether Clark's alleged injury impaired her capacity to earn money in the past. *See Ryan v. Hardin*, 495 S.W.2d 345, 349 (Tex. App.—Austin 1973, no writ) (loss or diminution of power or earning capacity is the ultimate issue).

In this context, we examine the evidence presented to the jury to make this determination. We have already noted that the evidence of injury was conflicting. From this evidence, the jury could reasonably have concluded that Clark's deficits were caused by something other than the accident. Alternatively, if the jury concluded that the deficits were caused by the accident, they could still reasonably conclude that such deficits did not impair Clark's ability to earn a living.

It is undisputed that Clark missed some amount of time from work, but the amount of time is less than clear. Clark testified that she returned to work two days after the accident. There are return to work releases from both Dr. Herzog and Dr. Warren authorizing Clark's return to work at different times, but there is no evidence to establish that Clark was not working, or unable to work during that time. Likewise, Dr. Herzog recommended a reduced workload, but there is no evidence that Clark acted on this recommendation.

Angelo Zambrano, a partner with Clark's law firm, testified that she did not know how long Clark was off work after the accident. Clark works from home, so Zambrano speculated that Clark could have been off work for some time. Clark has never been criticized for not billing enough hours and no special accommodations had to be made for her.

Clark is a salaried employee and received an annual salary of $315,000 and a $30,000 bonus the year of the accident. That bonus was $10,000 less than the previous year. Clark testified that she lost fifty to one hundred billable hours the year of the accident, but Zambrano testified that there was no way to estimate how such a reduction may have affected Clark's bonus because the firm's bonus grid changes from year to year. Clark continued to receive salary increases and bonuses each year, and by the time of trial, was paid a $395,000 salary with a $70,000 bonus.

Clark relies on the evidence that it is harder to do her job and she must make up for her inability to work long hours at the office by working nights and weekends.

But as with other testimony, the jury was free to credit this testimony as they deemed appropriate. *See City of Keller*, 168 S.W.3d at 819.

While the evidence presented may have made it difficult for the jury to calculate the value of any diminished capacity to make a living, the parties' focus on the presence or absence of a mathematical yardstick to guide that calculation puts the proverbial cart before the horse. Before assessing any value, the jury first had to determine that Clark's capacity to earn a living was, in fact, diminished. On this record, we cannot conclude that the jury's determination that Clark's ability was not diminished is clearly wrong, manifestly unjust, or shocking to the conscience.

2.      Future Lost Earning Capacity

Clark also challenges the jury's finding that she suffered no damages for future lost earning capacity. To this end, she contends that the jury "ignored the only evidence admitted regarding the extent of [her] symptoms, their permeance, and their ongoing impact on her work," and thus had no basis to conclude that her capacity to earn a living was unaffected.

But the evidence Clark offered about her symptoms and their cause was not, as Clark suggests, the "only evidence" in the case, nor was such evidence undisputed. Although Clark and her boyfriend both testified that she had to work

harder to maintain her high-level job performance, her performance reviews suggest otherwise.[4]

Clark's 2014 review, the year of the accident stated that Clark "consistently has high hours and the same holds true this year, even though she estimates she lost 50 to 100 hours due to a serious car wreck in which she suffered injuries." Clark acknowledged that for several years, she has consistently billed 2100 hours a year.

In 2015, Clark self-reported that she had a "great year," billing over 2000 hours, providing quality client servicing on a large number of corporate and financial transactions. Clark continued to receive strong performance reviews, accompanied by salary increases and substantial bonuses in 2016 and 2017.

Clark agreed that she is still productive, and her deficiency has nothing to do with client service. When asked if her work product suffered because of her injury, Clark replied, "absolutely not." She further testified that she has developed coping mechanisms.

Considering the medical evidence, together with the lay witness testimony, the jury could reasonably have found that Clark's deficits and the missed time from work did not diminish Clark's earning power or capacity. Accordingly, we conclude the jury's zero damage award for loss of past and future earning capacity is not

---

[4] Clark devoted considerable effort at trial endeavoring to prove that her injuries resulted in her being passed over for partnership at her firm. But the evidence shows that while there may have been some discussion about her partnership potential, she was never formally considered for partnership. Clark appears to concede on appeal that the jury was free to reject her claim that her injuries resulted in her failure to make partner, so our discussion is limited accordingly.

against the great weight and preponderance of the evidence. Clark's second issue is resolved against her.

**C.     Damages for Physical Impairment**

In Clark's third issue, she argues that the jury's failure to find damages for past physical impairment is against the great weight and preponderance of the evidence. According to Clark, the jury ignored uncontroverted evidence of an objective injury—specifically, her cognitive deficits. When, as here, a party challenges only one category of damages on the basis that the award in that category was zero or too low, we "consider only whether the evidence in that category is so against the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias." *Golden Eagle*, 116 S.W.3d at 775.

In support of her argument, Clark argues that Dr. Falkowski only disputed the severity and duration of her cognitive symptoms but could not identify another possible cause for the symptoms three days after the accident. Ergo, Clark maintains there was unrefuted evidence of impairment. We disagree.

First, the testimony is more nuanced than the single question and answer upon which Clark relies. In context, Dr. Falkowski explained that cognitive complaints are very common after an accident, but as you move further away from the event it is more likely that other non-neurological factors or non-accident factors would be at play. Dr. Falkowski noted that Clark reported a significant amount of stress related

to her work, sleep disturbances, and headaches prior to the accident. When counsel inquired if Clark had cognitive defects before the accident, Dr. Falkowsk responded that there was no pre-accident neurological evaluation in Clark's records. Further, Dr. Falkowski testified that there was no clear evidence of a concussion.

The experts disagreed about whether Clark's symptoms evidenced a brain injury, and the factfinder is free to disbelieve expert witnesses. *See Waltrop v. Bilbon Corp.*, 38 S.W.3d 873, 882 (Tex. App.—Beaumont 2001, pet. denied). The jury may also "disregard physician testimony on . . . the causal connection between the accident and the plaintiff's injuries, even if that testimony is not contradicted." *Mauricio v. Cervantes*, No. 04-16-00260-CV, 2017 WL 2791324, at *2 (Tex. App. —San Antonio June 28, 2017, no pet.) (mem. op.).

Moreover, even if we were to accept Clark's characterization that her subjective self-reporting of symptoms constitutes objective evidence of an injury, it does not compel the conclusion that the jury's failure to award damages was against the great weight and preponderance of the evidence. In *Golden Eagle Archery*, the Texas Supreme Court held:

> In keeping with the principles that a court may not substitute its judgment for that of the jury and that the jury is the sole judge of the weight and credibility of testimony, courts should not conclude that a jury's failure to award any damages for physical impairment is against the great weight and preponderance of the evidence simply because there is objective evidence of an injury.

*Golden Eagle*, 116 S.W.3d at 774.

"Physical impairment" encompasses the loss of the injured party's former lifestyle, the effect of which must be substantial and extend beyond any pain, suffering, mental anguish, lost wages, or diminished earning capacity. *Kroger Co. v. Brown*, 267 S.W.3d 320, 324 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Perez v. Arredondo*, 452 S.W.3d 847, 862 (Tex. App.—San Antonio 2014, no pet.).[5] The focus of this element of damages is not on the injuries or symptoms themselves, but whether they result in a substantial effect on the plaintiff's life activities or functions. *Patlyek v. Brittain*, 199 S.W.3d 781, 787–88 (Tex. App.—Austin 2004, pet. denied).

As previously discussed, Clark and her boyfriend described the impact of her alleged injury on her lifestyle. The jury was free to believe or disbelieve that this impact was substantial or so extremely disabling as to constitute physical impairment resulting from the accident. Accordingly, we conclude that the jury's finding was not against the great weight and preponderance of the evidence.

---

[5] Although we do not include an unchallenged, overlapping category of damages in our sufficiency review, *see Golden Eagle*, 116 S.W.3d at 774, we note that the jury did award damages for past physical pain and past mental anguish.

## III. CONCLUSION

Having resolved all of Clark's issues against her, we affirm the trial court's judgment.

/Dennise Garcia/
DENNISE GARCIA
JUSTICE

200545F.P05



# Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

C.D.C., Appellant

No. 05-20-00545-CV     V.

BETHANY STEWART, Appellee

On Appeal from the 134th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-16-08108. Opinion delivered by Justice Garcia. Justices Myers and Molberg participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee BETHANY STEWART recover her costs of this appeal from appellant C.D.C..

Judgment entered January 14, 2022.